1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ZEST IP HOLDINGS, LLC, a Delaware          CASE NO. 10cv0541-LAB (WVG)
     limited liability company; et al.,
12                                               **ORDER FOLLOWING *MARKMAN***
                                   Plaintiffs,   **HEARING**
13           vs.

14   IMPLANT DIRECT MFG., LLC, a Nevada
     limited liability company; et al.,
15
                                   Defendants.
16

17

18          The Court held a *Markman* hearing in this case on April 10, 2012.  The Court wants,

19   first, to commend the parties on their respective presentations.  The *Markman* briefs that the

20   Court read were good, but the presentations were exemplary.  They patiently walked the

21   Court through the technology at issue, the law of claims construction, and the bases for the

22   parties' proposed construction of the claim terms at issue.  The Court never got the sense

23   that the parties' arguments were insincere.  Obviously, it's the name of the game here for

24   Zest to construe the claim terms broadly to establish infringement later on, and for Implant

25   Direct to construe the terms narrowly to avoid infringement later on.  The Court senses that

26   Zest and Implant Direct have played this game in very good faith.  Now, onto what it means

27   to swivel.

28   //

                                            - 1 -                                    10cv0541

## I.    Claim Terms At Issue

There are only four claim terms at issue, all of which contain the word swivel or some form of it.  They are:

> the male member having an upper end comprising a swivel joint for swivel engagement within a cap (219 Patent, Claim 1 at 13:35–38; Claim 21 at 15:24–25)

> the swivel joint and cap cavity together comprising means for permitting swiveling of the cap over the male member (219 Patent, Claim 1 at 13:55–58; Claim 21 at 15:37–39)

> a swivel joint is provided between the cap and male retention member permitting swiveling of the cap over the male retention member (219 Patent, Claim 22 at 15:63–65)

> the retention member comprising part of a swivel joint for swivel engagement in a recess in a dental appliance (219 Patent, Claim 23 at 16:15–17)

(Zest *Markman* Br. at 7; ID *Markman* Br. at 6, 16.)  We'll call these claim terms the "swivel terms."

## II.    Proposed Constructions

Zest proposes the following construction of the swivel terms

> 'Swivel joint' and 'swivel engagement' should be construed as: 'a rotational or hinging connection between the male member and the cap, in which the rotational or hinging motion is around one or more axis.'

> 'Swiveling' should be construed as 'any rotational movement or hinging action between the male member and the cap, around one or more axis.'

(Zest *Markman* Br. at 7; Zest Presentation at 45.) Implant Direct proposes this alternative construction:

> The male member must be able to rotate around more than one axis within the cap, and there is relative motion between the cap and the male member.

(ID *Markman* Br. at 6, 16; ID Presentation at 19.)

## III.    Legal Standards of Claims Construction

The Federal Circuit's decision in *Phillips v. AWH Corp.* is the go-to source for the law of claims construction.  415 F.3d 1303 (Fed. Cir. 2005).  Useful, supplemental principles may appear in other cases, but in *Phillips* most courts can find all of the guidance they need.

1    **A.    First Principles - *Phillips***

2        Claims construction has to begin with the language of the claim terms.  *Id.* at 1312.

3    Those terms are to be given their ordinary and customary meaning, which is "the meaning

4    that the term[s] would have to a person of ordinary skill in the art in question at the time of

5    the invention."  *Id.* at 1312–13.  This person "is deemed to read the claim term[s] not only

6    in the context of the particular claim[s] in which the disputed term appears, but in the context

7    of the entire patent, including the specification."  *Id.* at 1313.

8        In some cases there's no need to look beyond the claim terms.  Their ordinary

9    meaning may be apparent and "claim construction . . . involves little more than the

10   application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

11   When this isn't the case, however, a court may have to turn to intrinsic or extrinsic evidence.

12   *Id.*  There are three sources of intrinsic evidence: (1) the claims themselves; (2) the

13   remainder of the patent specification; and (3) the patent's prosecution history.  *Id.*

14       The claims themselves matter for a couple of reasons.  First, "the context in which a

15   term is used in the asserted claim can be highly instructive."  *Id*.  Second, "[b]ecause claim

16   terms are normally used consistently throughout the patent, the usage of a term in one claim

17   can often illuminate the meaning of the same term in other claims."  *Id.*

18       Next, the patent specification.  Patent claims themselves, *Phillips* explains, are part

19   of a fully integrated document "consisting principally of a specification that concludes with

20   the claims."  *Id.* at 1315.  The specification is simply a written description of the invention.[1]

21   Here, that description consists of an Abstract, Background of the Invention, Summary of the

22

23        [1] Section 112, paragraph 1 of the Patent Act sets forth the specification requirement:

24            The specification shall contain a written description of the
             invention, and of the manner and process of making and using
25            it, in such full, clear, concise and exact terms as to enable any
             person skilled in the art to which it pertains, or with which it is
26            most nearly connected ,to make and use the same, and shall set
             forth the best mode contemplated by the inventor of carrying out
27            his invention.

28   35 U.S.C. § 112, ¶ 1.  *See also Carnegie Mellon University v. Hoffman-La Roche Inc.*, 541
     F.3d 1115, 1121 (Fed. Cir. 2008).

Invention, Description of the Preferred Embodiments, and numerous drawings.  That is the material in the 219 Patent that precedes the actual patent claims.  Not only must claims be read in view of the specification, but the specification is the best guide to the meaning of a disputed term.  *Id.* at 1315.  "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."  *Id.* at 1317.  A note of caution: The specification can only alter the plain and ordinary meaning of a claim term if it reveals a special definition "that differs from the meaning it would otherwise possess" *or* if it reveals "an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id.* at 1316.

A patent's prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  *Id*. at 1317.  It matters because, like the specification, it "provides evidence of how the PTO and inventor understood the patent" and "was created by the patentee in attempting to explain and obtain the patent."  *Id.*  At the same time, a patent's prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," and as a result it is less useful than the specification for claims construction purposes.[2]  *Id.*

Extrinsic evidence, which includes expert and inventor testimony, dictionaries, and learned treatises, is less significant than intrinsic evidence.[3]  *Id.* The Federal Circuit in *Phillips* identified five reasons for this.  First, extrinsic evidence isn't part of the patent and "does not have the specification's virtue of being created at the time of patent prosecution

---

[2] As with the patent specification, the patent prosecution history can only limit or alter the meaning of a claim term "by making a clear and unmistakable disavowal of scope during prosecution."  *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

[3] Not only is extrinsic evidence inferior to intrinsic evidence, but "[w]hen the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence."  *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). This is because the intrinsic evidence constitutes the record of the patent on which the public is entitled to rely.  "In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

for the purpose of explaining the patent's scope and meaning." *Id.* at 1318. Second, extrinsic publications may not have been written by someone of ordinary skill in the art. *Id.* Third, extrinsic evidence consisting of expert reports and testimony is often generated for the purposes of litigation "and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Fourth, given the "virtually unbounded universe of potential extrinsic evidence," a court may be overwhelmed with it and face the "considerable task of filtering the useful extrinsic evidence from the fluff." *Id.* Finally, undue reliance on extrinsic evidence vis-a-vis intrinsic evidence could "undermin[e] the public notice function of patents." *Id.* at 1319. Consideration of extrinsic evidence is left to the Court's discretion, and it should only be considered in the context of the intrinsic evidence. *Id.*

## B.    Supplemental Principle

During the *Markman* hearing (and in the parties' briefs) a dispute arose regarding claims construction standards that it's prudent to single out and address here. This issue does not appear to be squarely addressed in *Phillips*.

The dispute is whether the manner in which an invention actually functions should inform the claims construction analysis. Zest has taken the position that it shouldn't. It's the *claims* of the 219 Patent, after all, that Zest accuses Implant Direct of infringing, not any particular device that Zest manufactures and sells. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("Infringement . . . is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit.").

Federal Circuit precedent isn't on Zest's side. In *Medrad, Inc. v. MRI Devices Corp.*, the Federal Circuit held in no uncertain terms that the functioning of an invention is an appropriate consideration at the claims construction phase:

1
2
3
4
5
6

> Medrad argues that a court may not look to how an invention functions in determining the meaning of claim terms. Yet nothing in *Ecolab* or any other precedent of this court supports such a proposition, which is as unsound as it is sweeping. As we stated in *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed Cir. 1998), 'ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.' It is therefore entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language.

7  401 F.3d 1313, 1319 (Fed. Cir. 2005). None of this is to say that the manner in which an

8  invention functions is dispositive for claims construction purposes, or that courts *have* to

9  consider it. Presumably, it falls into the category of extrinsic evidence that may—or may

10  not—be useful in the construction of claim terms depending on how clear the intrinsic

11  evidence is.

12     It's this latter point that Implant Direct, in the Court's judgment, gets wrong. It may be

13  appropriate as a general matter, in construing claim terms, to look at how an invention

14  functions. But that doesn't mean that a party surrenders or waives a certain claim

15  construction just because of how a finished product embodying its patent comes together.

16  In other words, Implant Direct can't simply hold up Zest's LOCATOR attachment system and

17  argue that it trumps the construction of a claim term that would seem an incomplete

18  description of the device. That would make the *invention* self-defining in some sense, and

19  *that* would violate that bedrock principle of patent law that "the claims of a patent define the

20  invention." *Innova*, 381 F.3d at 1115. It is also, transparently, an ends-driven method of

21  construing claims. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir.

22  2009) ("Claims are properly construed without the objective of capturing or excluding the

23  accused device.").

24     Here is another way to make that point. Zest's LOCATOR "is one embodiment of the

25  patented system . . . ." (Zest *Markman* Br. at 1.) The Federal Circuit has held that "it is

26  improper to read limitations from a preferred embodiment described in the

27  specification—even if it is the only embodiment—into the claims absent a clear indication in

28  the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim*

*Co. v. Medrad*, 358 F.3d 898, 913 (Fed. Cir. 2004).  *See also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("When consulting the specification to clarify the meaning of claim terms, courts must not import limitations into the claims from the specification.  Therefore, when the specification uses a single embodiment to enable the claims, courts should not limit the broader claim language to that embodiment.").  The result of this is that a patent claim may cover embodiments that only partially implement that claim.  *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) ("Moreover, the language of the claims using the term 'selectively forwarding' clearly indicates that the patentee intended some claims to cover embodiments that implement only one of the disclosed routing schemes, as opposed to limiting every claim to the preferred embodiment that offers all three.").

**IV.     Discussion**

The Court will consider Implant Direct's proposed construction of the swivel terms first.  It has, by the Court's count, two core arguments.  The first is a purpose-based argument.  The second is a prosecution history-based argument.

**A.     Implant Direct's Purpose-Based Argument**

Implant Direct's main argument for construing the swivel terms to require that the cap rotate around more than one axis over the retention member derives from its understanding of the purpose of the 219 Patent.  What's that purpose?  Easy alignment between the male retention member and the abutment.  Here's how Implant Direct puts it:

> In order to achieve the goal of having the male member align with the abutment, the male member must be able to rotate within the cap around more than one axis.  In other words, the cap must be able to move in different directions.  If the cap is not free to move in more than one direction, then the male member would not be able to properly align with the abutment.  Abutments that are misaligned can point in any direction.  The male member must therefore be able to move in any direction in order to match up with the abutment.

(ID *Markman* Br. at 8.)  There is some support for this understanding of the 219 Patent in the specification, which explains that "[t]he pivoting of the nylon or resilient male in the metal

denture cap allows minor corrections for non-parallel abutments . . . ."[4]   (219 Patent at 5:29–31).  This description also finds some support in two of the specification's drawings, both of which depict the metal cap as being able to move forward and backward, and side to side, over the male retention member.  (219 Patent at Figures 4, 11.)  It also finds support in extrinsic evidence submitted by Implant Direct.  In particular, Zest's website contains an animated video of its LOCATOR attachment system in which it's obvious that the metal cap can rotate around the retention member on multiple axes.  Implant Direct played this video during its *Markman* presentation (and, to be honest, the Court found it independently while preparing for the *Markman* hearing, just to better understand the background technology). (ID *Markman* Presentation at 28.)

There seem to be two kinds of alignment at issue here.  The first, which Implant Direct seizes on, concerns the alignment of the overdenture *as a whole* over the gumline.  This alignment is enabled by each abutment "lining up," as it were, with its companion retention member.  And Implant Direct is absolutely right.  If abutments aren't perfectly in line with the retention members in the overdenture, it's beneficial that the retention members can pivot multi-directionally—around more than one axis, that is—within the metal cap.  Let's call this *macro* alignment.

The second kind of alignment, which Zest says is really the patent's achievement, concerns the manner in which an individual retention member comes into contact with and snaps onto the abutment.  Here, the focus isn't necessarily on seating the overdenture as a whole properly, but rather on getting the retention members to snap onto the abutments with minimal difficulty.  Let's call this *micro* alignment.  It finds some expression in the Background of the Invention section of the patent specification:

> It has been found that, in use, it is sometimes difficult for the wearer to properly locate the female socket, so that the mating, retentive end or head of the male part may hit the edge of the female part when the wearer inserts the denture.  Repeated impacts of this type may damage the retentive head of the male,

---

[4] Implant Direct explains in its *Markman* brief that the position of abutments can shift over time because the dental implants in which they're housed are themselves drilled into living bone tissue "which can change and move over time."  (ID *Markman* Br. at 7.)

> reducing or losing the retention force required for proper operation of the attachment.
>
> Other prior art attachments . . . do not always avoid the risk of damage to the retentive head of the male due to improper alignment with the female when re-inserting the denture or appliance.

(219 Patent at 1:17–31.)   It also finds some expression in the Abstract section of the specification:

> A skirt projects from the upper end of the male retention member and engages an outer locating surface of the abutment member as the members are secured together, acting to align the male member with the abutment members.

Implant Direct blurs macro and micro alignment.  In fact, in its *Markman* presentation it identified twenty-four appearances of "align" (or some form of the word) in the 219 Patent and *every appearance* concerns micro alignment.  For example:

> On re-insertion, for example, the user may fail to align head co-axially with socket.  In this case, the lower end of skirt will contact one side of the locating surface before the head reaches the socket.  Further downward movement . . . urges the male element to one side . . . to align head properly with the socket.  Thus, the locator surface portion of the female element together with the inner locating surface of skirt act to urge the head into proper alignment with the socket prior to snap insertion in the socket.  (219 Patent at 5:35–46.)
>
> As in the previous embodiments, when a patient attempts to re-attach a male element to female element, the lower end of the skirt will first contact locator surface, and will be urged into a centrally aligned position as the patient continues to urge the element downwardly.  Thus, the retention head will be properly aligned for snap engagement in the socket.  (219 Patent at 7:27–34.)
>
> In each of the embodiments, the male or snap-on element has a skirt which contacts an initially outwardly tapering surface on the female or locator element to provide a self-alignment of the parts.  (219 Patent at 13:9–12.)

(ID *Markman* Presentation at 25.)  It's clear that the misalignment the patent aims to correct isn't the result of divergent abutments as much as the simple difficulty to the user of seating the overdenture so that the retention members come into correct contact with even well-positioned abutments.  Perhaps the assembly of an IKEA bookshelf is a useful analogy.  Inevitably, there's a maddening step at which one piece with multiple, protruding pegs must

be fit to another piece with multiple holes to receive those pegs.  The step is maddening not

because the pegs and holes don't line up, but simply because they're small and hard to see

(and the two pieces are cumbersome).  Same with seating an overdenture, presumably.  The

retention members in the overdenture may be spatially or geometrically aligned with the

abutments just fine, but it may still be hard to "find" that alignment.  That's the problem the

patent addresses.  Zest explains it this way:

> This 'location' and alignment feature has nothing to do with any divergence of the implants, which is made clear in the specification.  Rather, it allows the patient to easily 'locate' the abutment and place the denture in the mouth without damaging it through repeated attempts.

(Zest Responsive *Markman* Br. at 2.)

There are other reasons to reject Implant Direct's purpose-driven construction of the

swivel terms.  One, the narration of the animated video of the LOCATOR makes it clear that

the misalignment the patent corrects is the result of the simple difficulty of lining up small

parts, *not* the result of non-parallel abutments:

> For over forty years, Zest Anchors has been a global leader in the design and manufacturing of overdenture attachments, pioneering self-aligning attachments that make it virtually impossible to improperly seat an overdenture . . . .
>
> During seating, while the LOCATOR male pivots inside the denture cap, the system's self-aligning design centers the male on the attachment before engagement.  These two actions in concert allow the LOCATOR to self-align into place, enabling patients to easily seat their overdenture without the need for accurate alignment, and without causing damage to the attachment components . . . .
>
> First, the rounded surface of the LOCATOR attachment allows the male to center on the attachment before engagement, so it can easily locate its proper position, while the LOCATOR male pivots inside the denture cap.  These two actions in concert allow the LOCATOR to easily self-align into place.

In fact, the narration explains that the point of the retention member pivoting within the metal

cap isn't to correct for non-parallel abutments during seating but rather to allow for the

overdenture to stay in place during chewing, in much the same way that the shocks of a

Jeep keep the chassis stable and level on rugged terrain.

The LOCATOR's innovative ability to pivot increases the

attachment's resiliency and tolerance for the high mastication forces an attachment must withstand . . . .

As the patient chews, the denture cap gently pivots over the male in any direction, to accommodate the natural movements during occlusion, and the pliancy of the soft tissue supporting the overdenture.

There is, to be fair, *one* reference in the video to the pivoting accommodating divergent implants:

The LOCATOR's innovative ability to pivot . . . allows it to compensate for the path of insertion, even with up to 40 degrees of divergence between implants.

But there's a critical point here. *Divergent* implants aren't necessarily *misaligned*—and Implant Direct's construction of the swivel terms assumes that the purpose of the patent is to correct for *misaligned* abutments. (*See* ID *Markman* Br. at 10 ("The express purpose of the swivel joint is to permit the male member to properly mate with a misaligned abutment."); Responsive *Markman* Br. at 1 ("The 'swivel' motion of the male member has a particular purpose in the '219 Patent.  It is necessary to permit the retention member to be oriented properly with abutments that may be misaligned.").)  Moreover, the statement that the pivoting allows the patent "to compensate for the path of insertion" reaffirms that the alignment at issue is simply what the Court has been calling micro alignment—bringing the retention members into proper contact with their companion abutments.

There is a final reason to reject Implant Direct's claim that the patent's chief purpose in pivoting multi-directionally is to correct for misaligned abutments: The patent specification specifically provides for "an angle correction . . . due to a divergent implant." (219 Patent at 6:28–31; 219 Patent at Figure 6.)

For the reasons given above, the Court rejects Implant Direct's argument that the swivel terms must be construed multi-dimensionally because the purpose of the patent is to correct for misaligned abutments.  As the Court reads the specification, the misalignment the patent aims to correct is the *user's* own misalignment in seating the denture.  Implant Direct is certainly right that the LOCATOR attachment system contains a metal cap that *can* rotate around the retention member on multiple axes, and that this would correct for abutments that

aren't perfectly aligned with retention members in the overdenture.  Indeed, the extrinsic video evidence shows that, some of the specification drawings show that, and language in the specification to the effect that the pivoting of the retention member in the cap "allows minor corrections for non-parallel abutments" suggests that.  But it's the claims that define the invention, and not the other way around.  The fact that an invention functions in a certain manner doesn't mean its claims must be limited to that manner of functioning.  *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation."); *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("This court's claim construction, however, did not and could not import into the claim a function from the specification, particularly when the claim recites only purely structural limitations.").

### B.   Implant Direct's Prosecution History-Based Argument

The prosecution history of a patent "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  Implant Direct invokes that principle and argues that Zest's proposed construction of the swivel terms was effectively disclaimed in the prior prosecution of the patent.

Zest's original application for the 219 Patent was rejected, or at least all of the claims were rejected.  (Dugger Decl., Ex. 4.)  The examiner found that certain claims were anticipated by a patent—the 367 Patent—held by Sulc.  Specifically:

> Sulc shows a dental attachment assembly for attachment to an adjacent tooth comprising . . . a cap 16 for securing in a recess in a dental appliance 26, the cap having a cavity for containing said swivel joint (upper end of male member 14) and allowing swivelling of the cap 16 over the male member 14.

(Dugger Decl., Ex. 4 at ¶ 4.)  The examiner also commented that the 219 Patent "appears to be directed to curved easily replaceable cap member and the releasable engagement of the cap member with the male member.  However, these functions have not been claimed." (Dugger Decl., Ex. 4 at ¶ 10.)  Zest then amended the 219 Patent to incorporate this critique as follows (with the amendment in bold)

1
2
3
4

   a male member for attachment to the abutment member, the male member having an upper end comprising a swivel joint for swivel engagement within a cap in a recess in a dental appliance, and a skirt projecting from the upper end of the male [retention] member for engagement over the outer locating surface of the abutment member, **the skirt having a rounded, convex outer surface**.

5
6
7
8

   a cap for securing in a recess in a dental appliance, the cap having a cavity for containing said swivel joint, **the cavity having a rounded, concave inner surface for releasable snap engagement over the rounded outer surface of the skirt**, the swivel joint and cap cavity together comprising means for permitting swivelling of the cap over the male member relative to the dental appliance.

9   (Dugger Decl., Ex. 5 at 2.) Zest's amendment also acknowledged the examiner's comment,

10   and explained these amendments in light of that comment:

11
12
13
14
15
16
17
18
19
20

   In paragraph 10 of the Office Action, the Examiner has noted features of the invention which have not been claimed, specifically the curved, easily replaceable cap member and the releasable engagement of the cap member with the male member, which features are not present in Sulc, where the male member 14 engages with the cap 16 via grooves and ridges. Amended claims 1 and 30 now define the cap as having a rounded, concave inner surface and the skirt of the male member as having a rounded, convex outer surface for releasable snap engagement in the rounded inner surface of the cap, which also permits swiveling of the cap over the male member. Such an engagement is not provided in Sulc. The skirt of the male member in Sulc does not have a rounded, convex outer surface, but is generally cylindrical. The inner surface of the cap 16 is of similar cylindrical shape and is also not rounded. Since these features are lacking from Sulc, it is submitted that amended claims 1 and 30 are not anticipated by Sulc, and reconsideration and reversal of the rejection of these claims is respectfully requested.

21   (Dugger Decl., Ex. 5 at 7–8.)  Implant Direct takes the position that because Zest amended

22   its claim to surrender a cylindrical cap that rotates horizontally around a cylindrical retention

23   member, it surrendered simple horizontal rotation altogether—and is committed to a

24   construction of the swivel terms that requires rotation around multiple axes.  As Implant

25   Direct puts it, "Zest surrendered any claim to a cylindrical male member and cap in favor of

26   a rounded connection between the male member and cap.  The structure disclosed in Sulc

27   was only capable of rotation, not swiveling."  (ID *Markman* Br. at 12.)

28   //

The Court certainly understands Implant Direct's argument, but it again appears to be importing a kind of functional description of Zest's invention into the construction of the claim terms.  In other words, it is arguing that because the metal cap can move around the retention member on multiple axes, the swivel terms cannot encompass rotation around just a single axis.  In context, however, Zest amended the 219 Patent application to articulate the snap connection between the retention member and the metal cap, not to elaborate on the rotational relationship between those two parts.  Its amendments, in fact, left the swivel terms absolutely alone.  As Zest pointed out in its *Markman* presentation, the examiner didn't even discuss rotational axes or imply that Zest's invention would have to embody multiple axes in order to overcome the Sulc patent.  (Zest *Markman* Presentation at 60.)  When Zest explained that Sulc's retention member and cap were cylindrical, this wasn't to make a point about their rotational relationship but rather the manner in which they connect to one another.  The Sulc patent contemplates a cap with ridges and grooves that physically retrains the retention member.  (Dugger Decl., Ex. 3, 367 Patent at 8:60–62.)  The 219 Patent, on the other hand, contemplates a concave cap that snaps over a convex retention member.

There's one final point that's important to make here, and which Zest makes in its pleadings.  Implant Direct says in its *Markman* brief that "[t]he structure disclosed in Sulc was only capable of rotation, not swiveling," the implication being that swiveling is a more complex form of movement.  (ID *Markman* Br. at 12.)  Sulc, according to Implant Direct, "teaches a joint where the cap rotates only in a flat manner around the male members."  (ID *Markman* Br. at 11.)  That obviously serves its argument here that the swivel terms must be construed to require rotation around more than one axis.  But in the examiner's own description of the Sulc patent, he uses the word "swivel" to describe simple one-dimensional rotational movement of the metal cap over the retention member.  (Dugger Decl., Ex. 4 at ¶ 4; ID *Markman* Br. at 10.)  The examiner therefore recognized that movement around a single axis *is* a swiveling movement.  That lends substantial credibility to Zest's proposed construction of the swivel terms and it undermines Implant Direct's alternative construction,

1   considering that a patent examiner may be considered a person of ordinary skill in the art

2   for claims construction purposes.  *In re Sang Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).

3          For the reasons given above, the Court doesn't find that the prosecution history of the

4   219 Patent favors Implant Direct's construction of the swivel terms over that of Zest.

5          **C.     Zest's Arguments**

6          Just because the Court disagrees with Implant Direct doesn't mean that it necessarily

7   agrees with Zest.  Here, however, it does.  As Zest points out, *nowhere* does the patent

8   specification use the phrase "multiple axes" or "more than one axis," and *nowhere* does it

9   define the swivel terms to only encompass rotation around at least two axes.  (*See* Zest

10  *Markman* Presentation at 48; Zest *Markman* Br. at 9.)

11         Zest also places great emphasis on the following language from the specification,

12  speaking of one embodiment of the patent.

13              The outer surface of skirt is convex or rounded, for snap-fit,
                swiveling engagement in a cavity of corresponding shape in the
14              cap . . . **This provides a swiveling, rotational movement or
                hinging action at the cap**, where the attachment is secured to
15              the denture or appliance, reducing wear, in a similar manner to
                that described in U.S. Pat. No. 5,417,570 referred to above.

16
17  (219 Patent at 5:23–29.)  The Court isn't sure that this language is as clear as Zest wants

18  it to be.  On one reading, "swiveling, rotational movement" is one kind of movement and

    "hinging action" is another—and the patent is capable of both.  This is consistent with
19
    common usage.  Think of a desk chair.  It swivels, meaning you can spin around in it.  It also
20
    hinges, meaning that you can lean back in it.  It's odd, though, to  read "hinging" into
21
    "swiveling"; we typically don't think of leaning back in a desk chair as swiveling.[5]  Zest wants
22
    the Court to construe "rotational" and "hinging" differently, which seems sensible, but  it also
23

24

25

26

27         [5] In its *Markman* presentation, Zest cited a dictionary definition of "swivel" according
    to which one object turns in a horizontal plane with respect to another.  (Zest *Markman*
28  Presentation at 46.)  This is what the Court has in mind when it considers a swiveling desk
    chair.

wants the Court to construe "swiveling" to include both.[6]  That's not consistent with this first

reading of the bolded language above, in which "swiveling" is more or less synonymous with

"rotational" but distinct from "hinging."  Implant Direct seems to have the better reading: the

swivel terms speak to rotational movement only.[7]

An alternative reading would read a comma into the bolded language in such a way

that swiveling does encompass both rotational and hinging movements.  Here's what that

would look like: "This provides a swiveling, rotational movement or hinging action, at the cap

. . . ."  Yet another reading would understand swivelling to include both rotational and hinging

movements, but wouldn't understand those movements to be distinct from one another.

Rather, it would understand "rotational movement" and "hinging action" to be roughly

synonymous and, in context, to work together to explain a particular type of motion.  When

there's no perfect word, sometimes it helps to use two, and saying the cap "hinges" over the

retention member could just be another way of saying it "rotates" over the retention member.

---

[6] For example, one of Zest's *Markman* presentation slides, referencing this language, contained the point, "The specification describes the 'swivel' connection between the male member and cap as rotational or hinging."  (Zest *Markman* Presentation at 47.)  Zest also insists these are distinct kinds of motion: "The contested phrases . . . are clearly and expressly defined by the inventors in the specification of the Patents-in-Suit to include several different and distinct types of movement—rotational or hinging—and each separate type of movement is encompassed by the claim term."  (Zest *Markman* Br. at 8.)

[7] Implant Direct, to recall, reads hinging entirely out of its construction of the swivel terms: "The male member must be able to rotate around more than one axis within the cap, and there is relative motion between the cap and male member."  (ID *Markman* Presentation at 19.)  The Court is actually uncertain if Implant Direct means to *equate* "rotational movement" and "hinging action," such that "hinging action" is surplus language that doesn't add anything, *or* if Implant Direct means to equate swivelling only with "rotational motion" and regard "hinging action" as something altogether different.

Implant Direct later suggests, however, that rotational movement is a kind of hinging:

> The motion of the cap is described in the specification as a "swiveling, rotational movement or hinging action at the cap."  The hinging action is therefore seen as having two distinct components: swiveling and rotational.  These two components should be included in the construction adopted by the Court.

(ID Responsive *Markman* Br. at 2.)  This seems very wrong.  However many plausible readings of the words "swiveling, rotational movement or hinging action" there are, this is not one of them.  It's not even consistent with Implant Direct's own proposed construction of the swivel terms, according to which swiveling *is* rotational movement, not distinct from it.

1

2      Ultimately, the Court agrees with Zest that "rotational movement" and "hinging action"

3   refer to separate types of movement.  Common usage supports that, and the usage in the

4   excerpt above—**This provides a swiveling, rotational movement or hinging action at the**

5   **cap**—supports that.   The Court also agrees with Zest that there is no minimum axis

6   requirement for the rotational movement.  Nowhere in the specification is such a limitation

7   to be found.  Finally, in spite of the confusions highlighted above inherent in the phrase

8   "swiveling, rotational movement or hinging action," "swiveling" encompasses both "rotational

9   movement" and "hinging action."  The patent specification consistently uses some form of

10  the word swivel to describe the manner in which the cap and retention member engage.  The

11  terms to be construed don't say "swivel *and hinging*" joint," or "swivel *and hinging*

12  engagement," or "permitting swiveling *and hinging* of the cap over the male."  They simply

13  say "swiveling" and leave *that* as the catchall term for the engagement.  The specification

14  goes on to make clear that this engagement is defined by "rotational movement or hinging

15  action."[8]

16

17      [8] Zest also points out that the 219 Patent incorporates the 570 Patent, and the 570
    Patent "uses the term 'swivel engagement' to describe a joint or engagement that allows
18  rotation or hinging movement and is ***not*** limited to multiple axes."  (Zest Suppl. *Markman* Br.
    at 5; 570 Patent at 1:30–44.)  That's an imprecise reading of the 570 Patent, which states:
19
20          According to the present invention, an anchor assembly is
            provided which comprises a female socket member for
21          attachment to a tooth root or implant, the socket member having
            a first socket, a male stud having a head at a first end shaped
22          for releasable snap engagement in the socket and a swivel joint
            at the opposite end, a cap for connection to a dental appliance,
23          the cap having a second socket, the swivel joint being adapted
            for engagement in the second socket in the cap, and allowing
24          hinge motion of the stud relative to the cap.

25          Preferably, some rotational movement is also permitted between
            the first end of the stud and the first socket, so that movement
26          is provided at both ends of the attachment, both where it
            attaches to the tooth root or implant, and where it attaches to the
27          cap.

28  The precise reading of this is that *hinging* defines the swivel engagement between the male
    stud (or the retention member) and the cap, whereas "rotational movement" defines the
    engagement between the male stud and the female socket (or the abutment).  Moreover, the

1    So Zest is right.  "Swivel joint" and "swivel engagement" should be construed as "a

2  rotational or hinging connection between the male member and the cap, in which the

3  rotational or hinging motion is around one or more axis."  Likewise, "swiveling" should be

4  construed as "any rotational movement or hinging action between the male member and the

5  cap, around one or more axis."  (Zest *Markman* Presentation at 45.) [9]

6        **D.    Severability of Rotational Movement and Hinging Action**

7        There is one important matter that has to be cleared up in order for the above claim

8  construction to be useful at trial.  That is Implant Direct's potential construction of *the Court's*

9  *own construction of the claims* in a manner that achieves its proposed construction after all.

10  Here's what Implant Direct could argue: *If a "swivel joint" or "swivel engagement" means "a*

11  *rotational or hinging connection between the male member and the cap," the cap must be*

12  *able to rotate around **and** hinge over the male member.  And that means it must be able to*

13  *move on at least two axes.*

14  _____

15  phrase "some rotational movement is also permitted" in the second paragraph may be read
    to imply that "rotational movement" and "hinge motion" are roughly synonymous.  The "also"
16  does the work there; if it's "also" permitted at the abutment-end of the male stud, the
    implication is that it's originally permitted somewhere else, namely where the male stud
17  engages with the cap.  So, the 570 Patent isn't as helpful as Zest wants it to be.

18        [9] The Court wants to address one argument Implant Direct makes for its dual-axis
    theory of interpretation that doesn't fit neatly in the structure of this Order.  It is this: Implant
19  Direct seizes on the following language in the specification of the 219 Patent:

20              Other prior art attachments utilize a male head which is in
                releasable snap engagement with a female socket, but do not
21              provide a double hinging action since the male part is secured
                in a denture cap with no freedom of movement.

22  (219 Patent at 1:24–26.)  Presumably, Implant Direct wants to suggest that "double hinging
    action" suggests movement of the cap around at least two axes with respect to the retention
23  member.  (*See* ID *Markman* Presentation at 16.)  This isn't right.  The "double-hinging" action
    here refers to the fact that the male member can move with respect to the cap and also with
24  respect to the abutment; that is, there is movement at both the cap and abutment ends of
    the retention member.  (*See* Zest *Markman* Br. at 10–11.)  The specification is clear on this:
25
26              In each of the above embodiments, a male or snap-on
                attachment is provided which is secured at one end to a cap and
27              at the other end to a female or locator element, with both ends
                of the male having some freedom of movement relative to the
28              part to which it is secured.

    (219 Patent at 12:59–63.)

1   The Court won't allow that construction.  First, it ignores the distinction, present in the

2   specification, between "rotational movement" and "hinging action."  Indeed, Implant Direct's

3   proposed construction either equates swiveling strictly with "rotational movement," or

4   equates "rotational movement" with "hinging action," and either way runs afoul of the Court's

5   conclusions that "swiveling" includes both "rotational movement" and "hinging action" *and*

6   that these are distinctive.  Second, as Zest argues, nowhere in the specification or other

7   intrinsic evidence is there any requirement that the cap *both* rotate around and hinge over

8   the retention member.  It's true that the 219 Patent is capable of both rotation and hinging,

9   but Implant Direct cites no authority for the proposition that the functionality of the 219 Patent

10   is severable such that its own device need only do half of what the 219 Patent can do in

11   order to avoid infringement.  So, to be clear, the Court construes the swivel terms as

12   describing a cap that rotates around a retention member, and also a cap that hinges over

13   a retention member.  The 219 Patent, in effect, just happens to allow both.

14   **E.   Location of the Swivel Joint or Engagement**

15   At the *Markman* hearing, the Court suggested that the heart of this case seemed not

16   to turn on the nature of the swiveling action but rather on *where* in the dental attachment

17   system the swiveling takes place.  In other words, the Court was concerned that the claims

18   it was being asked to construe wouldn't impact, ultimately, the question of infringement.  So,

19   to be clear, the Court construes the swivel terms as pertaining *only* to the swiveling of the

20   cap in relation to the retention member.  Not only is that explicit in the claim terms at issue,

21   but Zest's own proposed construction, which the Court adopts, reflects that: "'Swivel joint'

22   and 'swivel engagement' should be construed as: 'a rotational or hinging connection

23   **between the male member and the cap**, in which the rotational or hinging motion is around

24   one or more axis.'"  (Zest *Markman* Presentation at 45 (emphasis added).)

25   The Court makes this clarification because Zest seems to reach farther in its original

26   *Markman* brief and ask for a construction of the swivel terms that also includes swiveling of

27   the retention member in relation to the abutment:

28   In the end, the "swiveling" action is designed to permit
     movement between the male retention member and the cap (or

recess) *as well as* between the male retention member and the female element.   As a result, to the extent construction is required, the phrases at issue should be defined as "any rotational movement or hinging action that allows for relative motion between the cap and the male member and/or between the male member and the abutment."

(Zest *Markman* Br. at 11.)  The 219 Patent may *elsewhere* claim a swiveling motion, or some kind of motion, between the retention member and the abutment, but not in the claims the Court has been asked to construe.  As far as the Court is concerned, the fact that Implant Direct's accused device  appears not to allow the cap and retention member to move in relation to one another, and instead allows only for the retention member to move in relation to the abutment, is more critical to the infringement question than the above claims construction.  The Court was clear about that during the *Markman* hearing, and it is worth bearing in mind going forward.  (*See* ID Suppl. *Markman* Br., Ex. 1.)

## V.    Conclusion

The Court adopts Zest's proposed construction of the swivel terms, as explained above.  "Swivel joint" and "swivel engagement" will be construed as "a rotational or hinging connection between the male member and the cap, in which the rotational or hinging motion is around one or more axis."   Likewise, "swiveling" should be construed as "any rotational movement or hinging action between the male member and the cap, around one or more axis."   (Zest *Markman* Presentation at 45.)   The 219 Patent encompasses "rotational movement" and "hinging action" independently, too; it does not require both.  Finally, the swivel terms only apply to the physical connection between the cap and the retention member.  Zest's motion to exclude the testimony of Dr. Niznick is **DENIED** as moot.  The

//

//

//

//

//

//

1  Court found some of his testimony helpful to gaining a background understanding of

2  overdenture attachment systems, but his testimony didn't serve Implant Direct's cause

3  beyond that.

4

5          **IT IS SO ORDERED**.

6  DATED:  May 15, 2012

7

8          **HONORABLE LARRY ALAN BURNS**
          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10cv0541