1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

ZEST IP HOLDINGS, LLC ET AL., .
4                                  . Docket
         Plaintiffs,              . No. 10-cv-00541-GPC-WVG
5                                  .
              v.                   . January 4, 2013
6                                  .
IMPLANT DIRECT MFG. LLC           . 1:30 p.m.
7   ET AL.,                        .
                                   .
8        Defendants.              . San Diego, California
. . . . . . . . . . . . . . .
9
             TRANSCRIPT OF MOTION HEARING
10       BEFORE THE HONORABLE GONZALO P. CURIEL
             UNITED STATES DISTRICT JUDGE
11
             A-P-P-E-A-R-A-N-C-E-S
12
For the Plaintiffs:       Mayer Brown LLP
13                        1675 Broadway
                          New York, NY 10019-5820
14                        By:  LISA M. FERRI, ESQ.
                               MANUEL J. VELEZ, ESQ.
15                        -AND-
                          Mayer Brown LLP
16                        350 South Grand Avenue
                          25th Floor
17                        Los Angeles, CA 90071-1503
                          By:  JOHN H. LIEN, ESQ.
18
For the Defendants:       Kleinberg & Lerner, LLP
19                        1875 Century Park East
                          Suite 1150
20                        Los Angeles, CA 90067-2501
                          By:  MICHAEL HUREY, ESQ.
21                             CHRISTOPHER DUGGER, ESQ.
                               ROBERT N. TREIMAN, ESQ.
22
Court Reporter:           Chari L. Possell, RPR, CRR
23                        USDC Clerk's Office
                          333 West Broadway, Suite 420
24                        San Diego, California 92101
                          chari_possell@casd.uscourts.gov
25   Reported by Stenotype, Transcribed by Computer

1    SAN DIEGO, CALIFORNIA; JANUARY 4, 2013; 1:30 P.M.

2                          -o0o-

3              THE CLERK:  Number 4 on calendar, case number

4    10-cv-0541, Zest IP Holdings, et al., versus Implant Direct,

5    et al., for a motion hearing.

6              THE COURT:  Good afternoon.  May I have counsel state

7    their appearances, please.

8              MS. FERRI:  Good afternoon, Judge.  Lisa Ferri, with

9    Mayer Brown, on behalf of Zest Anchors and Zest IP Holdings.

10   With me today is Manuel Velez, also of Mayer Brown, on behalf

11   of plaintiffs also.

12             THE COURT:  Good afternoon.

13             MS. FERRI:  And John Lien from our Los Angeles office

14   also on behalf of plaintiffs.

15             THE COURT:  Good afternoon.

16        And on behalf of the defense?

17             MR. HUREY:  Good afternoon.  Mike Hurey, Kleinberg

18   Lerner.  With me, Robert Treiman and Christopher Dugger.

19             THE COURT:  Thank you.  We are here on motions to

20   amend/correct infringement contentions, and motion to join

21   Implant Direct Sybron International and Implant Direct Sybron

22   Manufacturing LLC pursuant to Rule 25(c).

23        I have reviewed the pleadings, and my tentative ruling

24   would be to grant the motion to join Implant Direct Sybron

25   International, and at this point I will accept any further

1   argument on that motion.

2       And with respect to the motion to amend/correct

3   infringement contentions, I have a series of questions that I

4   would like to pose to the plaintiffs regarding that motion to

5   further assist me in ascertaining the issues of prejudice, the

6   issues of further delays that may be occasioned by granting

7   such a motion.

8       So first, let me inquire as to my tentative ruling on the

9   motion to join Implant Direct Sybron, whether or not the

10  defense wishes to make any further argument at this time.

11          MR. HUREY:  Yes, Your Honor, we would like to.

12          THE COURT:  Please.

13          MR. HUREY:  In our opposition brief, Your Honor, we

14  presented three arguments why it would be improper to add

15  Sybron entities at this time as defendants in this action.

16      First, the plaintiffs did not serve the Sybron entities

17  with the motion as required by Rule 25.  It's a requirement

18  that's in the rule.  Plaintiffs know how to serve motions.

19  They didn't do so.  They chose not to.  It was their own choice

20  not to do it.  Service is a jurisdictional issue.  If the party

21  is not properly served, the question is whether or not the

22  Court has jurisdiction over them.  Adding Sybron is contrary to

23  requirements of the rule with respect to service.

24      Secondly -- and this is probably our most important

25  argument, Your Honor -- is that plaintiffs knew a long time ago

1    about this transaction and knew about the existence of Sybron

2    entities a long time ago.  Approximately 18 months before the

3    motion was filed, they had a copy of the transaction agreement

4    and knew all the details.  They simply chose not to file a

5    motion at that time.  Rule 25 requires a motion to be filed for

6    a party to be joined.  Plaintiffs gave no real reason why they

7    delayed.

8         In their reply brief, they say, "We didn't want to because

9    we didn't want to burden the Court with unnecessary motion

10   practice."  Well, that's part of the requirement, to get Sybron

11   joined, was to file a motion.  They chose not to file a motion.

12   And then 18 months later, after discovery is almost complete,

13   after expert witnesses have been designated, after the *Markman*

14   hearing has been held and everything like that, all the

15   proceedings of the Court, then they decide to bring in the

16   motion to add Sybron.  The delay is unwarranted and operates to

17   the prejudice of my client.

18        And finally, the plaintiffs waited until after the Court

19   scheduling order.  There was a scheduling order here.  And they

20   chose to disregard that and bring their motion after the time

21   had passed.

22        I am not quite sure what the Court's basis is for granting

23   the motion, so perhaps I might inquire as to the reasons why.

24             THE COURT:  Well, at this point, there's little

25   question that as far as the identity of interest between

1    Implant Direct and the successor company, that they shared a

2    similar identity with respect to who manages the entities, the

3    line of work, the acquisition of the assets via the original

4    company, and the acquisition of the intellectual property that

5    is subject of this litigation.

6         And apparently -- and correct me if I'm wrong -- at this

7    point, would it be correct to say that Implant Direct

8    Manufacturing's counsel would be the same as that of the Sybron

9    parties as well?

10             MR. HUREY:  Not at all, Your Honor.  My firm does not

11   represent the Sybron entities in this lawsuit.  We do not have

12   authority to speak for the Sybron entities in this case.  The

13   Sybron entities may well decide to hire their own counsel.

14             THE COURT:  The allegation is that, essentially,

15   Sybron has been participating in these proceedings through your

16   offices acting as counsel.  How do you respond to that?

17             MR. HUREY:  That's simply not true.  We have never

18   made an appearance for Sybron in this lawsuit.

19             THE COURT:  They haven't been a party.

20             MR. HUREY:  That's correct.

21             THE COURT:  As far as the notion -- and I will hear

22   from the plaintiffs with respect to their contentions as

23   well -- but I believe that the plaintiffs assert that during

24   the course of these proceedings, it's been some type of

25   understanding that your representation extended to Sybron.  You

1    disagree with that?

2         MR. HUREY:  We certainly disagree with that.  My firm

3    has never told plaintiff or plaintiff's counsel that we

4    represent Sybron in this lawsuit.  There were other complaints

5    filed, but separate matters, not in this lawsuit.  We don't

6    have authorization from the client, from Sybron, to act on its

7    behalf in this lawsuit.  We only represent the earlier Implant

8    Direct entities with respect to defense.

9         THE COURT:  Let me hear from plaintiff's counsel with

10   respect to, first, on the issue of no service on the motion,

11   the argument that was presented by the defense at this time.

12        MS. FERRI:  Thank you, Your Honor.  I can quickly run

13   through the responses to the statements made by opposing

14   counsel.

15        THE COURT:  Go ahead.

16        MS. FERRI:  And then maybe just add a few other

17   things that may be helpful to the Court in terms of

18   understanding some of these points.

19      First of all, Your Honor, in terms of the service issue

20   that Implant Direct's counsel brings up, what we did in terms

21   of bringing this motion is we served it on counsel, who we

22   believe are counsel for Implant Direct Sybron, Kleinberg &

23   Lerner.

24        THE COURT:  Why do you believe that?

25        MS. FERRI:  Your Honor, in this particular case, they

 1  have put in objections on behalf of Implant Direct Sybron

 2  employees, namely Roy Chang, when we moved for his deposition.

 3  That was really the first inkling, Your Honor, that we

 4  received, which was back last summer.  Up until that point,

 5  Implant Direct Sybron had acted as if they were in this case.

 6  They produced documents.  They produced witnesses.  A 30(b)(6)

 7  witness on behalf of defendant was this Roy Chang, the CFO.

 8        THE COURT:  Walk me through that.  You said Sybron

 9  essentially was acting throughout these proceedings.  Keep in

10  mind that there is identity of interest where the same

11  controlling members of Implant Direct are now part of the

12  Sybron group.

13        MS. FERRI:  Right.

14        THE COURT:  How were you able to break it out that

15  these individuals were acting on behalf of Sybron?

16        MS. FERRI:  Well, Your Honor, I think that in our

17  papers, we set out a fairly good chronology from the very

18  beginning of the early neutral case evaluation in front of

19  Judge Gallo.  In-house counsel came along, from Sybron, and

20  noted to Judge Gallo that they would be involved in the case.

21  We discussed the fact that this transaction happened at the end

22  of 2010.  And from that point on, we certainly were aware that

23  under Rule 25 there is no limitation as to when a motion to

24  join must be made.  It doesn't even have to be made.

25        The way the law works is that the successor-in-interest

1    steps into the shoes and the suit can continue on with the

2    original named defendants; otherwise, any time there's a

3    transfer of interest, you would have to file a new suit, and

4    that's really what 25 guards against.

5        So we understood, certainly, the rule was there, but we

6    never received any objection.  So they came to the mediation.

7    We served document requests, and we asked specifically for

8    Implant Direct Sybron documents because we knew, of course, as

9    of January 1, 2011, that Implant Direct was now Implant Direct

10   Sybron.  Dr. Niznick, who was the head of the company, was the

11   head.  Same products, facilities, employees, web address;

12   everything the same.

13       So we continued to act with them, and when we asked for

14   documents, we never received any objection that, "Oh, they are

15   not a party to this case.  You are not entitled to Implant

16   Direct's Sybron documents."

17       Implant Direct, who was the predecessor and now has no

18   corporate relationship whatsoever with Implant Direct Sybron

19   other than a predecessor, produced the documents.  How would

20   they have control or possession or custody to produce a

21   different entity's documents?  They are not a parent,

22   subsidiary, or even sister entities with the same parent.  They

23   are two different corporations.

24       So when Implant Direct says, "Oh, yes, we gave you the

25   witnesses; we gave you the documents because one entity can do

1    that for another entity," that simply makes no sense.

2         Now, Implant Direct Sybron gave us their financials, their

3    research and development, their most proprietary documents.  We

4    deposed all of their witnesses, from the CEO, to the head of

5    engineering, to the vice president, to the CFO.  We never

6    received any objection that they were not a party or that they

7    were not acting as a party or were not part of this litigation

8    until this summer.

9         And in the summer, when we first received this objection

10   to producing Roy Chang, because supposedly he was Implant

11   Direct Sybron and they are not a party, we moved immediately

12   for this.  So there's no argument, really, of prejudice because

13   they functioned as if they were in this case.

14        And we knew, of course, from the transaction agreement

15   that Implant Direct Sybron took on virtually all of the assets

16   and all of the liabilities, including, specifically, this

17   lawsuit.  They went into this with their eyes open, and the

18   transaction agreement says one of the assumed liabilities is

19   this litigation.

20        When Dr. Niznick appeared as a witness at the *Markman*

21   hearing in front of Judge Burns, I cross-examined him, and I

22   asked him specifically about this transaction and this deal.

23   And I asked him if Implant Direct Sybron was now responsible

24   for any judgment in this lawsuit.  So should the products be

25   found to be infringing, would Implant Direct Sybron be subject

1    to paying the damages?  And he answered, sworn testimony, yes,

2    Implant Direct Sybron has taken on that liability.

3         So it's very clear that they are a successor-in-interest.

4    It's very clear that Rule 25 says that successors-in-interest

5    step into the shoes, and the suit continues on so that if you

6    receive a judgment, the successor is basically on the hook for

7    that.  That is black letter law.

8         So what we have here is just, in my mind, a refusal on the

9    part of Implant Direct's counsel to accept that that is the

10   law.  And even if we didn't move to join them, they would be

11   responsible because we have it in black and white.  The

12   transaction agreement says, yes, we assume this liability.

13        What we did was we made this motion, Your Honor, because

14   all of a sudden in the summer, they started making these

15   objections.  The first one was that this new product should not

16   be part of this suit -- and I call it a new product.  It is not

17   a new product.  We will get into that.  It is just a new

18   version of the product that is already in the suit and is

19   alleged to be infringing.

20        But they threw up that objection.  They did not want to

21   bring Roy Chang for a deposition.  They started objecting to

22   producing documents.  And then they started saying they

23   wouldn't be liable for any damages.

24        And this is the part that I think is a shame, Your Honor,

25   because what they are doing is it's not a defense, for

1    instance, like, "We don't infringe; we have a legitimate

2    defense."  What they are saying in this motion is if this

3    product is found to be infringing, "Zest, you can't collect any

4    judgment from us.  Implant Direct is a defunct entity, just a

5    paper corporation.  And Implant Direct Sybron wasn't in the

6    suit, so you can't collect from anyone.  Start over."

7            THE COURT:  I think I have heard enough with respect

8    to that particular issue.

9        But I did want to, if not pepper you, I did want to pose

10   some questions about the new iteration, the new product, which

11   you are seeking to add to these proceedings.  And it's been

12   asserted by the plaintiff that basically there are no new

13   infringement theories; that, essentially, that the new product

14   is pretty much just a tweaking, of sorts, of what was already

15   brought into this litigation; is that correct?

16           MS. FERRI:  Yes, Your Honor.  If I might --

17           THE COURT:  So, that's correct.

18       But then let me ask, the defense asserts that what we have

19   here is something fundamentally different with respect to the

20   connections that are used here.  And as I understand it,

21   there's three basic elements or three basic instrumentalities

22   as a part of this attachment: the abutment, and then there's a

23   male, and I believe there's a cap?

24           MS. FERRI:  Yes.

25           THE COURT:  All right.  So with respect to the

1   original allegations that were challenging the offending

2   products, the connections were by the external surface of the

3   abutment, and now there's a reference to internal connection

4   between the abutment and the nylon male member.

5        And considering we are talking about an attachment system

6   that involves, I take it, dental implants; is that right?

7             MS. FERRI:  Yes, Your Honor.

8             THE COURT:  And something as fundamental as the form

9   of connection, whether or not it is internal or external, would

10  sound like it would be a significant, if not departure, a

11  significant difference from what was earlier alleged.

12       And so to the extent that it would be fundamentally

13  different, we wouldn't be really talking about -- well, we

14  would be talking about a new infringement theory that would

15  require discovery, that would require experts to weigh in on

16  whether or not there was, in fact, infringement.

17       So I would like you to walk me through, I guess, the

18  basics of what we have here at this point and compare it to

19  what was previously included within the pleadings and show me

20  how at this point we don't have a new infringement theory, and

21  how at this point we also have sufficient specificity set forth

22  in the diagrams and documents provided by the plaintiffs that

23  would allow the defense to prepare an adequate defense in this

24  matter.

25             MS. FERRI:  Your Honor, if I might, we put together a

1    few binders that have some graphics.  So I think visually, if I

2    show this to you, it is easier than describing it.

3              THE COURT:  Have you shown it to defense counsel?

4              MS. FERRI:  I will provide them with it also.  May I

5    hand it up to the bench?

6              THE COURT:  As long as you provide a copy to counsel.

7              MS. FERRI:  Yes.

8        Judge, I would like to describe to you this product

9    because it sounds as though you have taken a look at this, and

10   I wanted to discuss it, just in case, and I actually have a

11   model, Your Honor.  And I say that, Your Honor, because I have

12   to admit that before this case, I had heard of implants, but I

13   was not familiar with all of this technology.

14       And as Your Honor described, this is basically an

15   attachment.  This is a very large version of what would go in

16   your mouth.  And basically, it attaches the denture, be it a

17   bridge, a full denture, a prosthetic tooth of some sort into an

18   implant.  So this end gets screwed into your implant.  And then

19   this is affixed to the denture.  And you have the ability to

20   attach it in this way.  As Your Honor mentioned, there's three

21   pieces:  This abutment; there's inside here, a nylon cap; and

22   on the outside, this metal cap.  So this fits together, and

23   this is the attachment.

24             THE COURT:  What is referenced as the male?

25             MS. FERRI:  Yes.  This inside is the male, Your

 1  Honor, this nylon.  This is the abutment.  We call this the

 2  locator, which is the Zest product.  We call this nylon --

 3  which it's really a cap inside a cap.  The nylon part is a

 4  male.  I believe Implant Direct calls this a liner.  But

 5  basically we have called it a male.  In the patent, it is a

 6  male, and that's the best way to describe it.  And then the

 7  metal cap.

 8      What we are talking about today in terms of the amendment

 9  to our infringement contention doesn't deal at all with the

10  abutment.  That's exactly the same.  And it doesn't deal with

11  the cap.  That's the same.  Only thing that's changed here is

12  the male.

13      And if you were to look, Your Honor, in the notebook we

14  put together, I think -- this is tab 3 -- it's a very good

15  rendition.  Tab 3 has -- this is the alleged infringing

16  product, and it is the -- on the left-hand side, what we call

17  the old version of the male.  That's green.  And on the right,

18  the gray, which is the newer version.

19      As you can see, the product itself did not change, the

20  GPS, the overall product.  What this allows the customer to do

21  is either purchase and use either the new male or the old male.

22  The cap stays the same.  As you can see, the difference, the

23  main difference here is that this center part of the male is a

24  bit longer on the gray than the green.  And that was the change

25  that was made, Your Honor.

No. 10-cv-00541-GPC-WVG

1    So that's why we say it is just an iteration.  This

2  product here, the GPS, is in plaintiff's infringement

3  contentions because this is the product that they came to the

4  market with, on the left.  And then --

5    THE COURT:  Walk me through something.  As I

6  understand it, the defense asserts that the connection was

7  previously between the external surface of the abutment and the

8  nylon liner and cap, and now we have this internal connection.

9  But looking at what appears to be the male portion of this, it

10  appears that it goes over the abutment in a like fashion; that

11  is, within the internal part of the abutment.  And I guess I am

12  trying to figure out, what is the difference we are talking

13  about as far as the external male and the internal male?

14    MS. FERRI:  Your Honor, the internal and external are

15  simply names that Implant Direct has given this to make them

16  sound, I think, in their papers to be completely different.

17    I would call them the old and the new version.  And

18  basically, we asserted the very same infringement theories, the

19  very same claims of the patents, against the old version and

20  the new version.  It is not any different in terms of our

21  infringement contentions.  That's why we do not believe that it

22  offers any new issues in this case.

23    And I believe the cases that we have cited, Your Honor --

24  there's a number from the Northern District of California on

25  this very issue of amending infringement contentions.  The

1   Courts found in those decisions, for instance the *Seiko*

2   decision that we rely on quite a bit, that when you are not

3   adding new theories, when you are adding a new model, and in

4   particular when this model wasn't available to you when you

5   first put your infringement contentions in -- so when we served

6   our infringement contentions in April 2011, all we were aware

7   of was the older version.

8       I learned, of course, in deposition from Dr. Niznick that

9   he had actually designed and invented the newer version a year

10  earlier, he told me, March 2010.  They simply did not tell us

11  about that.  It wasn't until his deposition in the summer of

12  2011 that he mentioned he had a newer version of this male.

13      We asked immediately for all documents related to that.

14  And as you know from our papers, Your Honor, they gave us

15  nothing.  We had to go before Judge Gallo and move to compel

16  production of this.

17      So really, in the words of the Court, in the *Seiko* case,

18  if they feel there's any prejudice, it was self-inflicted.

19  They refused to provide us this until a year later.  We got

20  this in May 2012, and we moved immediately to add this to the

21  case.

22      So you know, the fact that you would not give this to us,

23  you would hold this back, make us go to court and get an order

24  compelling the diagrams and the samples of this, and then come

25  to court -- I think it really takes a bit of nerve to come to

1    court and say, "We are prejudiced because we tried to hide this

2    from you for over a year, and when we finally gave it to you,

3    it was really prejudicial to add it."

4            THE COURT:  Why don't you walk me through something

5    else that I came across.  I believe it was asserted that

6    Implant Direct sells over 55 version of GPS abutments that

7    differ in the platform --

8            MS. FERRI:  Yes.  Your Honor, I think what we are

9    referring to there was they gave us five samples, and what we

10   wanted to do was test all the different types of product, so it

11   took us a few weeks to order others.

12      But the connection that we are all looking at, the

13   connection between here, that's not different in any of these

14   versions.  I will give you an example.

15           THE COURT:  My question was, as to the 55 other

16   versions, would it be the plaintiff's contention that all 55

17   versions would be infringing and offending type of products?

18           MS. FERRI:  Yes.  They are just -- for instance, Your

19   Honor, if I showed you, they are just sizes.  This is the

20   locator.  This is our product.  But you can see the top is

21   always the same, but there's different gum heights for

22   different patients --

23           THE COURT:  What exhibit is that?

24           MS. FERRI:  -- but these would all be the same

25   product.

 1        This is found under tab 2.  We call these cuff heights.

 2   So they are basically sizes.  Like, if you had a sweater, and

 3   you got small, medium, large, extra large.  The sweater is the

 4   same.  Those versions don't affect the infringement analysis at

 5   all.  The infringement analysis goes to the top portion,

 6   basically, as I was showing Your Honor.  The patent covers

 7   these three components: abutment, male, cap.

 8        So all we would be doing in terms of -- what we have done,

 9   because we served these infringement contentions on them last

10   summer, so they know what they are.  All we did was basically

11   say, in the same exact contentions, the old male and the new

12   male.  So it doesn't create any new patent claims.  They are

13   the exact same patent claims, the exact same patents.

14        What the courts have said, Your Honor, on those cases,

15   when you are not coming to the Court with a new theory that you

16   just developed late in the case -- that can be problematic.

17   But the Courts have said that one of the clearest examples of

18   being able to show good cause to amend infringement contentions

19   is when the defendant brings a new product to the market that

20   there was no way you could have had it at the time you put your

21   original infringement contentions in as long as you move

22   diligently after you find out about this.

23            THE COURT:  Let me ask.  What if on the eve of trial

24   the defendant were to produce yet a new iteration of this metal

25   cap, and it was just different in a few particulars, but

1   essentially, it was just the next generation of this same

2   device.  Are you saying that at that point plaintiffs should be

3   entitled to yet again modify and amend?

4           MS. FERRI:  Well, Your Honor, what I would say to

5   your scenario is what is different about the scenario vis-a-vis

6   what happened in this case is that perhaps the Court might say,

7   if you hid that new iteration from the other side until the eve

8   of trial in hopes of gaining an advantage, then that may be

9   self-inflicted prejudice.

10      I think that if it wasn't hidden, and they just came out

11  with it on the eve of trial, that there would have to be an

12  examination by the Court whether any new claims or any new

13  patents were added.

14      But I would give the Judge here, Your Honor, an example of

15  the very recent *Apple v. Samsung*.  These cases here in

16  California, in the news all the time.  Apple brings a new

17  version of the iPod or iPad Mini, and the Judge in that case

18  has let all these come in because they are just new versions,

19  iterations, but it is not changing the basics of the case.

20      And here, if you were to compare our infringement

21  contentions on the new male with the old male, you would see

22  that we are -- our allegations are exactly the same.  The

23  claims, the reason they infringe are the very same reasons.

24           THE COURT:  So you are saying that in the

25  *Samsung/Apple* case in the Northern District, Judge Koh would

 1  have had an issue related to this in terms of amending and

 2  modifying?

 3          MS. FERRI:  There's been some amendment, and I

 4  believe in that case, the difference is the parties -- most of

 5  the time the parties certainly agree to allow a new iteration

 6  to come in.  Because oftentimes during the course of the

 7  litigation, someone will come up with a new model.  So it's

 8  understood, and especially in the Northern District.  We cited

 9  a number of cases, *Vasudevan Software; Tivo; Stanford*

10  *University v. Roche*.  In all of these, the Court said it was a

11  new product that came out in the midst of the litigation.  That

12  meets good cause.  We are going to allow it in.

13      One thing that I thought was important, Your Honor, was

14  that often in these cases, the Courts say, "Look, the claims

15  are the same; the patents are the same; there's no new theories

16  because of that."

17      And the fact that there already was a claim construction

18  hearing, which defendants have brought up, the Court -- in

19  *Vasudevan Software* and *Stanford* and in the *Seiko* case, the

20  Court rejected that.  All three decisions, the Court rejected

21  that argument because the claim construction, the hearing, goes

22  to the patent.  You don't look at the products.  The product is

23  irrelevant.  You look only to the intrinsic evidence.  So in

24  each one of those cases, the Court found that the fact that

25  there was already a claim construction didn't create any issue.

1   And in one of them, the Court said, "Look, even if there was an

2   issue, all we would do is have supplemental claim construction

3   later on in the case."  The Court in that, Judge Seeborg, can

4   have a supplemental claim construction order.  But it is not a

5   basis to have a whole new litigation.  That would be, I think,

6   a true waste of judicial resources and the parties' resources.

7       Here, we went to the claim construction hearing before

8   Judge Burns.  The defendant was able to put forward whatever

9   terms they wanted regarding the claims.  The terms that they

10  now say they might want to have the judge construed, we have

11  that, Your Honor, the joint chart in our book here, tab 5.

12  They put in those terms about the snap engagement.  After the

13  hearing was done -- Judge Burns spent the whole day with us,

14  and we discussed this.  Dr. Niznick came and testified about

15  it.  As you will see in tab 7, the supplemental *Markman* brief,

16  when the hearing was over, they wrote to Judge Burns and

17  withdrew those claims.  They said, "Judge, we don't need you to

18  construe the snap engagement.  We know we had it in there.  We

19  discussed it at the hearing, but we don't need you to."  Now

20  they come to court and say we should have done that.  But they

21  had that opportunity.  No one asked them -- we didn't ask them

22  to withdraw it.  They did that on their own.

23      They went to the *Markman* when they knew they had this

24  other version of their male.  The hearing was in April 2012.

25  Judge Gallo had already compelled them to provide us the

1   documents and the samples because we had told Judge Gallo we

2   needed to make the infringement assessment.  So they went into

3   the *Markman* with their eyes open that they had another version

4   of their male.

5       I think to put your head in the sand and come to court and

6   say you are prejudiced -- the only prejudice would really be to

7   Zest here to have to file a new suit.  If there's additional

8   supplemental claim construction prior to trial, we can ask Your

9   Honor to do that.

10      But I think the overwhelming case law that we have cited

11  states that good cause is shown if you couldn't, despite your

12  diligent efforts, you couldn't have a product that wasn't

13  released yet at the time of your infringement contentions and

14  especially if the other side keeps that discovery from you,

15  forces you to have an order compelling that production.

16      And what the Court in the *Stanford University v. Roche*

17  case said that was very helpful, I thought, was that discovery

18  is broader than just the accused product.  We are entitled to

19  discovery about this product, and they just failed to provide

20  it to us.  And the judge stated in that case that simply

21  because they delayed the discovery, they cannot claim

22  prejudice.

23      So, Your Honor, I think overall, the position we have on

24  this is that we did everything we could to be diligent.  As

25  soon as they produced this to us under order of Court, we made

1    the assessment.  We added it.  They have had our infringement

2    contentions on this new version of the male since the summer,

3    so they know what our theory is.  They know the theory is

4    exactly the same as it was for the earlier version.

5             THE COURT:  How do you respond to their argument that

6    you have not provided sufficient specificity in your chart

7    identifying each element of each asserted claim?

8             MS. FERRI:  Well, Your Honor, first, I would note to

9    Your Honor that they brought that motion to Judge Gallo early

10   on in this case, and they lost.  Judge Gallo denied their

11   motion.

12            THE COURT:  That didn't relate to the current --

13            MS. FERRI:  Well, our current infringement

14   contentions are with the same specificity.  As I said to Your

15   Honor, it's basically the same infringement contentions in

16   terms of the specificity that we have in there for the new

17   iteration as with the old iteration.

18       But, Your Honor, if I were to just show you this, I think

19   this would make it very clear to you in terms of this, at

20   tab 2, Your Honor.  This is the locator.  This our version.

21   You will see it's almost exactly the same.

22       The history of this case, Your Honor, that you will learn

23   and see as we go to trial, is that Implant Direct was a

24   distributor of ours.  They distributed the locator, and then

25   they decided to just make their own version of it.  So they are

1   almost identical.  There's certainly no credible argument that

2   they could make that they don't understand how we believe their

3   product is infringing.  It's virtually the same as ours.  It's

4   called a clone.  It is a generic version, a cheaper version of

5   the locator product.  It has to be like ours because they sell

6   it to be compatible with our male and cap.  So, Your Honor,

7   they sell theirs so this can fit together.  If you want to take

8   the Zest male and cap, according to them, and use it with our

9   abutment, it fits together.  They are compatible.  That's part

10  of our infringement allegations against them.  They used our

11  own blueprints and measurements to make this.  It's exactly the

12  same as ours.  It has to fit together.

13      The fact that they could say, "We are looking at these

14  infringement contentions and we don't see how -- your theory of

15  infringement," it's basically what we call a knockoff.  It is a

16  clone.  So they very well know our theories.

17      In addition to our infringement contentions, Your Honor,

18  we have given them very detailed interrogatory answers that are

19  in narratives, flowing paragraphs, that cite all of our

20  documents and what we are using for support.  It outlines our

21  entire theory of infringement.  So there is no doubt they don't

22  understand it.  And that theory of infringement would be the

23  same for the new male as for the old.

24          THE COURT:  Let me hear from the defense on this.

25  And specifically, if you could start with the use of the terms

1  internal connection versus external connection, and how those

2  are demonstrated with reference to Exhibit 3.

3         MR. HUREY:  Yes, Your Honor.  Before going to that, I

4  had a few points I would like to make with respect to the

5  joinder motion, unless the Court would prefer I not address

6  that.

7         THE COURT:  I will let you have a minute or two on

8  that.

9         MR. HUREY:  With respect to the joinder motion, there

10  were a couple of points they have raised about Implant Direct

11  Sybron entities being liable for anything from that Implant

12  Direct -- any damages that may be assessed against Implant

13  Direct.  That is simply not true.  There is an indemnification

14  provision in Section 8.1 of the transaction agreement.  That's

15  on page 68 of the agreement, where Implant Direct is required

16  to idemnify Implant Direct Sybron for any damages that might

17  arise out of this litigation.  So that point that counsel made

18  is not true.

19     Counsel also argued Implant Direct producing documents --

20         THE COURT:  What if the original entity is defunct?

21  The indemnity would go by the wayside, or wouldn't be worth

22  anything, correct?

23         MR. HUREY:  The original entity would have an

24  obligation to indemnify to the extent that it had assets,

25  correct.

1        THE COURT: Right. But then, as far as

2  responsibility to the plaintiffs for any liability created by

3  these products, you are not suggesting that Sybron would not be

4  a successor-in-interest, are you?

5        MR. HUREY: We have not argued in the opposition

6  motion that there is no successor-in-interest, that there isn't

7  any identity. We have not made that argument. The motion

8  doesn't seek a finding of that, any successor liability or

9  alter ego theory, or anything like that. The motion simply

10  seeks leave to join. For the reasons we've stated, we think

11  the motion is improperly brought. It is untimely. It's late.

12     But the point I am trying to make is the arguments counsel

13  is making as to why this motion is appropriate at this time,

14  those points are incorrect.

15     Counsel also argued about Implant Direct Sybron producing

16  documents. Implant Direct has the ability to get those

17  documents from Implant Direct Sybron. There is a cooperation

18  clause in the transaction agreement, section 5.1, on page 54 of

19  the transaction agreement, which is attached as one of the

20  exhibits to our opposition papers. That requires the two

21  companies to cooperate with each other in litigation. So

22  implant Direct Sybron has an obligation to turn over documents

23  to Implant Direct. And of course, in discovery, if a party has

24  ability to obtain documents, even if not their own documents,

25  those documents must be produced. So implant Direct had every

1   obligation to go to Implant Direct Sybron and ask for the

2   documents.  And as a practical matter, Implant Direct was able

3   to get the documents, and that's why the documents were

4   produced.

5       But Implant Direct Sybron never produced any documents.

6   Implant Direct Sybron never, as a legal entity, searched for

7   documents and turned over documents.  It was Implant Direct

8   that always did the producing.

9       Counsel argued that Implant Direct Sybron made objections

10  in this lawsuit, and that's not true either.  Implant Direct

11  made the objections.

12      With respect to the deposition of Roy Chang, my firm, on

13  behalf of Implant Direct, issued an objection to the deposition

14  notice because Mr. Chang is not an employee of Implant Direct.

15  Never was.  He is an employee of Implant Direct Sybron.

16      Mr. Chang retained independent counsel to represent him at

17  the deposition.  Implant Direct merely served an objection,

18  noted Mr. Chang was not an employee of Implant Direct, and

19  therefore could not be compelled to appear by deposition notice

20  under the applicable rules.  That was the only objection.  It

21  was not an objection made on behalf of Implant Direct Sybron.

22  My firm issued an objection on behalf of Implant Direct simply

23  noting the manner in which plaintiff sought the deposition of

24  Mr. Chang was improper.  Mr. Chang, like I said, retained

25  independent counsel to represent him at the deposition.

1    Mr. Dugger, of my office, was there as well.  But Implant

2    Direct -- my firm did not issue any objections on behalf of

3    Implant Direct Sybron.

4        This concept that Implant Direct Sybron is somehow

5    participating in this litigation -- that's simply not true.

6    All appearances, all arguments have been made on behalf of

7    Implant Direct and Implant Direct only.  So there's been no

8    overlap, as it were.

9            THE COURT:  All right.

10            MR. HUREY:  I apologize, Your Honor.  Your question

11   with respect to --

12            THE COURT:  Yes, with respect to the request to

13   modify and otherwise amend, your argument points out that

14   there's a fundamental difference between the earlier offending

15   products and what's been raised at this time, and that, most

16   notably, it's by virtue of the form of connection that the old

17   or the original challenged items were connected externally,

18   versus the new, which is an internal connection.

19        So, looking at Exhibit 3, it looks like both the -- first

20   of all, do you agree that this diagram or this chart accurately

21   reflects what was originally challenged on the left-hand side

22   and what's being sought to be added now on the right-hand side

23   of this document?

24            MR. HUREY:  Yes, with the caveat that it is a

25   poor-resolution drawing.  It doesn't give good detail.  I think

1  counsel specifically chose this version because it doesn't

2  exactly show what's going on.

3          THE COURT: So then if you could walk me through,

4  then, how we come up with these terms of the external

5  connection and the internal connection.

6          MR. HUREY: Yes, Your Honor. Take a look at tab 3,

7  the item on the left, the one with the green nylon portion.

8      The Court can see that the -- sort of the outer legs that

9  come down there, those snap on and hold the outside of the gold

10  portion, which is the abutment. The inner portion of the green

11  that comes down, when it's seated in there, it does not touch

12  the abutment. There is no snap on the inside portion of the

13  abutment.

14      The internal connection is shown on the right, the gray

15  nylon. The legs that come down on the outside are flared

16  outward, if the Court can see that.

17          THE COURT: Yes.

18          MR. HUREY: The portion in the middle is a round

19  ball, and it snaps into the inner portion of the abutment.

20      We attached as an exhibit -- I am sorry -- Exhibit

21  Number 2 to one of the declarations of Dr. Niznick, a

22  cross-section of Number 2, if I can approach the Court.

23          THE COURT: Are you saying that the new iteration

24  only snaps to the abutment from the inside, internally?

25          MR. HUREY: That's correct. That's correct.

1     THE COURT:  So as far as the outside, that doesn't

2  provide the coverage or the --

3     MR. HUREY:  There's no retention.  There's no contact

4  between the outer portion of the nylon and the outside of the

5  abutment.

6     THE COURT:  No form of connection.

7     MR. HUREY:  They might rest against each other, but

8  there's no gripping connection.

9     In the drawing that I have just handed up to Your Honor,

10  the internal portion that comes down on the male member, what I

11  have shown is a cross-sectional view of just the nylon.  It is

12  a little bit difficult to see because it is an engineering

13  drawing.  But I have highlighted in red the shape that comes

14  down.  That is on the new product, the different product.

15     So the manner that the male member connects to the

16  abutment is vastly different in these two products.  There's

17  the external connection of the green, in tab 3, and the

18  internal connection of the gray in tab 3.  Counsel's argument

19  these are minor differentiations are not true.

20     When you take a look at the patent claims, the vast

21  majority of the language in the patent claims talk about the

22  way the male member connects to the abutment.  That's the heart

23  of the matter, the crux of the issue, is how does the male

24  member connect to the abutment, and that's been changed in the

25  two different products at issue here.  And allowing them to

1    change infringement contentions now would be severely

2    prejudicial to our client.

3         There's one other thing I would like respond to, Your

4    Honor, about the issue we hid this.  We didn't hide anything.

5    This product had not been accused of infringement.  Plaintiffs

6    sent out document requests.  We had objections to the document

7    requests.  We met and conferred as required by the local rules.

8    And as available to it, counsel filed a motion to compel, which

9    we lost, and we produced the documents.  There was nothing

10   hiding.  We just had a disagreement about whether or not those

11   documents were relevant and needed to be produced.  There was

12   no hiding.  Once Judge Gallo ruled against us, we produced the

13   documents.

14        THE COURT:  Let me hear further from the plaintiff

15   with respect to the additional descriptions of what we have

16   here; that, in essence, that there is, if not a fundamental,

17   there is a difference in these connection devices and I take it

18   how they anchor themselves to the abutment.  One would appear

19   to anchor itself from the inside, providing the tension from

20   the inside that would cause this tight fit, and the other is

21   more akin to, I guess, a soda bottle, where you have a cap

22   which creates the tension from the outside.

23        MS. FERRI:  Your Honor, what I would say is that I

24   think that we have gone just slightly astray here perhaps on

25   what our intention with the infringement contention is in the

1    case.  Because plaintiff is now being asked to basically prove

2    its case through these infringement contentions.

3        The purpose is just to give notice to the defendant of

4    what claims of our patents we believe their product infringes

5    and how it infringes.  By --

6            THE COURT:  I guess that's important.

7            MS. FERRI:  -- pointing out what elements.

8        And how we do that is we point what element we believe

9    infringes the element of the claim, so which piece of theirs.

10   When our claim says there is an abutment with an outer locating

11   surface, we have to say and point to that their product has an

12   outer locating surface.  So we don't have to prove that that's

13   the case.  We do that in front of the jury.  We will have an

14   expert say why a person of ordinary skill in the art -- that's

15   a term patent lawyers use -- but why someone who is skilled in

16   this art, a dental technician or dentist, would say, yes, this

17   is an outer locating surface on the product, and we feel it

18   meets this element of the claim.

19       So we are just giving notice that we believe this product

20   infringes because it has an element.  But we don't have to

21   explain the details of the proofs.  The proofs will come out in

22   the case.  So what we are doing is giving them notice.

23       As you can tell, they have their answers ready.  They have

24   had a lot of notice.  We have gotten all the documents.  When

25   it comes to what discovery would be necessary, we have asked

1    Dr. Niznick about this, what they call the internal.  He's

2    described it to us.  He told me in his deposition why he thinks

3    it doesn't infringe.  I already know that.

4         My client disagrees.  We believe the internal -- what they

5    call the internal and what they call the external both

6    infringe.  And all we have to do, all we are required to do in

7    infringement contentions is put them on notice of it.  We don't

8    have to prove it.  That's what the trial is for.

9              THE COURT:  I guess in a way, I disagree in terms of

10   just providing the notice.  It is more than just providing

11   notice; it's notice plus.  Notice plus the opportunity to put

12   together a defense.

13        What you are saying right now is, in some ways, the

14   defendant has had that opportunity by virtue of the fact you

15   have already explored some of these issues during the

16   deposition of the doctor.

17             MS. FERRI:  Yes, Your Honor.  And I believe we have

18   explored these issues because although, Your Honor, they may

19   disagree with us -- and of course they have that right to -- we

20   said the same things about the earlier iteration.  Because even

21   though they look different, the new male and the old male, we

22   believe they both fall within our claims.  We have been having

23   this argument, if you want to call it that, or discussion about

24   we believe that these males, when combined with the cap and the

25   abutment, infringe.  And we have given them the infringement

1  contentions, and we have pointed out we believe those aspects

2  of these products infringe.

3      So they are aware of these theories.  And Dr. Niznick

4  spent a long time looking into this, as he explained to me in

5  the deposition, in terms of trying to come up with a product

6  that he thinks gets around our patent.  We just disagree with

7  that.

8          THE COURT:  Let me ask you.  Is it your view that any

9  form of a metal cap with a nylon liner that you put on top of

10  this abutment would be in violation of a patent held by the

11  plaintiff?

12          MS. FERRI:  Well, Your Honor, it couldn't be any

13  form.  It has to fall within our claim.  The claims of our

14  patent has certain requirements.  We took their product.  We

15  matched them up against our patent claims.  We did some testing

16  of their products, and we found they fall within our claims.

17      So we believe the new and the old version of this very

18  same product is infringing.  And we have given them the

19  notices.  And as I have said, they have had our infringement

20  contention since last summer.

21      I think the answer here, Your Honor, is if there's

22  something additional that they need, I don't think, in my mind,

23  the answer is a whole 'nother lawsuit.  We have already spent

24  two and a half years on this case.  I think to me, Your Honor,

25  the suggestion would be what do we do?  We haven't even

1    exchanged expert reports yet.  They have time to include this.

2    They actually have to wait to get our expert report and see how

3    we describe it so their expert can rebut our report.  So

4    there's time for this to be done.

5         But I think it's -- we would say my client would be

6    greatly prejudiced because we had to take time to go for an

7    order compelling production of this, and it took a while, when

8    they had this in their hands for a whole year before that.  It

9    was a -- it would be a great prejudice if my client now had to

10   start a whole 'nother lawsuit on this product when, as you can

11   see when I showed them side by side, the abutment and the cap

12   is exactly the same.  So we are going to be doing the same

13   depositions.  They would produce the same exact documents to

14   us, Your Honor.  They at least have told us they have given us

15   all the documents on this product.

16        So when you talk about discovery, it would be the

17   plaintiff that would say they need discovery.  We are not

18   saying that.  We are saying I took Dr. Niznick's deposition.

19   We took Ines Aravena's deposition.  They told us about this,

20   what they are calling the internal.  We have all the blueprints

21   and the technical drawings.  We have everything -- at least we

22   believe they have produced to us everything they have on that

23   product.

24        They have our infringement contentions.  There's really

25   nothing more to be done in terms of discovery.  It's time to

1   move on to the expert phase with this.  We just produced our

2   inventors to them.  They didn't ask them -- although our

3   inventors, of course, aren't going to know anything about their

4   product anyway.

5       But I would say, Your Honor, that this happens fairly

6   routinely in cases that a new version or new model of a product

7   comes out, and the parties I think deal with that in the way we

8   have done here, which is give depositions, give documents.  But

9   we feel like this should go before the jury because it would be

10  a tremendous waste of resources to have to impanel a whole

11  'nother jury just over this other male.

12          THE COURT:  Thank you.

13          MS. FERRI:  Your Honor, I want to just bring to the

14  Court's attention one thing I would like to correct because I

15  don't believe counsel was 100 percent correct on the other

16  motion.

17      When he mentioned that there's an indemnification

18  provision, there is, and it is in the transaction agreement.

19  We cite it in our papers.  There is a provision that there will

20  be indemnification only for the sales -- this is on the part of

21  Implant Direct -- only for the sales before the transaction.

22  Once the closing went through, then Implant Direct Sybron has

23  assumed all liabilities.  They are not indemnified.  The

24  language right here is, you know, only to the extent that it

25  results from the sale of these customer offerings prior to the

1    closing.  And I asked Dr. Niznick that at the *Markman* hearing,

2    and he testified that's exactly true.  The indemnification is

3    only prior to the closing.

4         So after the closing, Implant Direct Sybron is on the

5    hook.  But the analysis under the law is just have you assumed

6    the liability because, as Your Honor pointed out, the

7    indemnification may not come through.

8              THE COURT:  Thank you.

9         Any final reply?

10             MR. HUREY:  Yes.  A couple of points, Your Honor, if

11   it's all right.

12        Going back to the joinder motion on the indemnification,

13   that is exactly the point I make; there was a clean break of

14   Implant Direct before the transaction and Implant Direct Sybron

15   after the transaction.  Implant Direct is required to idemnify

16   Sybron for anything before the transaction and Sybron is

17   responsible for anything afterwards.  There's a break between

18   the two companies there.

19             THE COURT:  All right.

20             MR. HUREY:  One other point that I realized is in my

21   notes and I forgot to make earlier was the issue about Sybron

22   stepping into the shoes of Implant Direct.  Counsel made that

23   analogy a number of times, Sybron merely steps into the shoes

24   of Implant Direct.

25        That's not true.  Rule 25 doesn't say anything about a

1   company stepping into the shoes of another company or a party

2   stepping into the shoes of another party.

3        A motion has to be brought in order to join the new entity

4   as a party.  That is what has to be done.  That's what is

5   required by Rule 25.  Plaintiff decided not to file a motion

6   when it knew about this in the beginning.  18 months before it

7   filed this motion, it knew about the transaction agreement.  It

8   made a choice not to file the motion.  It decided to wait

9   because it didn't want to file a motion, as it said in the

10  reply papers; didn't want to burden the Court with unnecessary

11  motion practice.

12       Well, the motion is necessary.  It's required to bring

13  Implant Direct Sybron into the case.  And plaintiff simply

14  decided to wait 18 months before deciding it belatedly wanted

15  to bring them into the case, and my client has been prejudiced

16  because of that for the reasons we set forth in the brief.

17       If I can get back to the infringement contentions, if

18  that's all right, counsel said defendant made this argument to

19  Judge Gallo, which is true.  We complained about the infringing

20  contentions when they were first served a year and a half, two

21  years ago.  We complained about them then.

22       At that point, at the settlement conference, Judge Gallo

23  said he thought at that point in the case the contentions

24  minimally met the standards required by the rule.  There's no

25  transcript from the hearing, so I am going from memory.  But my

1    recollection, Your Honor, is Judge Gallo said because no

2    discovery has been done, we had not produced any engineering

3    drawings, we had not produced information about the products,

4    that he would not require at that time the plaintiff to

5    supplement their infringement contentions.

6         Defense are not happy with the contentions that currently

7    exist.  We pointed out to the Court, to Judge Gallo previously

8    and written a letter to Judge Gallo -- we expect to have

9    further briefing on January 18 of this year -- about why those

10   infringement contentions are inadequate.  We believe that the

11   infringement contentions that were served with respect to the

12   first product, the external connection, we believe those

13   infringement contentions don't meet the requirements of local

14   rules and don't provide defendants with enough information to

15   be able to respond.

16        The new infringement contentions on the new products have

17   the same deficiencies.  We pointed this out in our brief.  It

18   merely lists every element of every claim, and it simply says

19   these are infringing.  These are literally under the doctrine

20   of equivalents.  Counsel has just argued, she needs to point

21   out -- plaintiff must point out to defendant where these

22   infringing elements exist.  They haven't done that.  They

23   simply say, "These are the elements of the claim; defendants

24   have them; therefore, there's infringement."  There's no

25   "pointing out" going on in any of the infringement contentions.

No. 10-cv-00541-GPC-WVG

```
 1       The contentions as written, as exist in plaintiff's moving

 2  papers, don't meet the requirements of the local rules

 3  especially now that they have had discovery, now that they have

 4  seen all our drawings and understand how our product works.  We

 5  don't believe the Court should allow the infringement

 6  contentions to be amended especially in the manner they

 7  currently exist.

 8            THE COURT:  All right.  Thank you.

 9       At this time, I am going to take the matter under

10  submission, and I expect we will have something in the next

11  week or so.  All right.

12            MS. FERRI:  Thank you, Your Honor.

13            THE COURT:  Thank you.

14            MR. HUREY:  Thank you.

15            THE COURT:  Could we hold on to at least --

16            MS. FERRI:  Absolutely, Your Honor.  Those are for

17  you.

18            THE COURT:  All right.  And I will hold on to this as

19  provided by the defense as well.

20            MR. HUREY:  Thank you.

21            THE COURT:  Thank you.

22       (End of proceedings.)

23                          -o0o-

24

25
```

```
 1              C-E-R-T-I-F-I-C-A-T-I-O-N

 2

 3         I hereby certify that I am a duly appointed,

 4  qualified and acting official Court Reporter for the United

 5  States District Court; that the foregoing is a true and correct

 6  transcript of the proceedings had in the aforementioned cause;

 7  that said transcript is a true and correct transcription of my

 8  stenographic notes; and that the format used herein complies

 9  with rules and requirements of the United States Judicial

10  Conference.

11      DATED:  January 7, 2013, at San Diego, California.

12

13                      /s/  Chari L. Possell
                        _____
14                      Chari L. Possell
                        CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25
```