1

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8                    **SOUTHERN DISTRICT OF CALIFORNIA**

9   ZEST IP HOLDINGS, LLC, a            CASE NO. 10cv541-GPC(WVG)

10  Delaware limited liability company;  **ORDER:**
    ZEST ANCHORS, LLC, a
    Delaware limited liability company,

11                                        **1) GRANTING IN PART/DENYING IN
                                          PART IMPLANT DIRECT SYBRON**
                          Plaintiffs,     **INT'L AND IMPLANT DIRECT**
12                                        **SYBRON MFG., LLC'S ("IDSI")
                                          OMNIBUS MOTION FOR**
13                                        **JUDGMENT ON PLEADINGS/
                                          SUMMARY JUDGMENT**
14

15                                        [Dkt. No. 475.]

        vs.
16                                        **2) GRANTING IN PART/DENYING IN
                                          PART IMPLANT DIRECT INT'L,**
17                                        **IMPLANT DIRECT LLC, AND
                                          IMPLANT DIRECT MFG., LLC'S**
18                                        **("IMPLANT DIRECT") MOTION
                                          FOR PARTIAL SUMMARY**
19                                        **JUDGMENT AND TO AMEND
                                          INVALIDITY CONTENTIONS**
20

21                                        [Dkt. No. 478.]

22  IMPLANT DIRECT MFG. LLC, a            **3) DENYING IDSI'S MOTION IN
                                          LIMINE TO EXCLUDE REPORT**
23  Nevada limited liability company;     **AND TESTIMONY OF DR. SUSAN
    IMPLANT DIRECT LLC, a                 SCHWARTZ MCDONALD**
    Nevada limited liability company;
24  IMPLANT DIRECT INT'L, a               [Dkt. No. 444.]
    Nevada corporation,
25                                        **4) DENYING IMPLANT DIRECT'S
                          Defendants.     MOTION TO EXCLUDE THE**
26                                        **EXPERT WITNESS TESTIMONY OF
                                          DR. ROBERT C. VOGEL**
27

28                                        [Dkt. No. 450.]

                              - 1 -                        [10cv541-GPC(WVG)]

**INTRODUCTION**

Presently before the Court are two omnibus dispositive motions and two evidentiary motions filed by Defendants Implant Direct Sybron International and Implant Direct Sybron Manufacturing, LLC (collectively, "IDSI"); as well as Defendants Implant Direct Mfg. LLC, Implant Direct LLC, and Implant Direct International (collectively, "Implant Direct"). (Dkt. Nos. 444, 450, 475, 478.) The Parties have fully briefed all four motions. (*See* Dkt. Nos. 472, 484, 494, 495, 496, 497, 504, 505, 508, 509, 539, 542, 555, 556, 557.)[1] A hearing was held on October 14, 2014. (Dkt. No. 537.) Lisa Ferri, Esq., Manuel J. Velez, Esq., and Andrew Edelstein, Esq. appeared on behalf of Plaintiffs Zest IP Holdings, LLC and Zest Anchors LLC (collectively, "Plaintiffs" or "Zest"); Christopher Mead, Esq. and A. James Isbester appeared on behalf of the IDSI Defendants; and Michael Hurey, Esq., Christopher Dugger, Esq., and Robert Treiman appeared on behalf of the Implant Direct Defendants.

The IDSI and Implant Direct Defendants move the Court for judgment on the majority of Plaintiffs' theories of liability for patent infringement, trademark infringement, false designation of origin, false advertising, and unfair competition regarding Defendants' conduct occurring prior to December 31, 2010.[2] Based on a review of the Parties' briefing, the lengthy record, submitted evidence, oral arguments by the parties, and the applicable law, the Court: (1) DENIES WITHOUT PREJUDICE IDSI's Motion in Limine to Exclude Report and

---

[1]After the hearing on the present motions, IDSI filed an "*Ex Parte* Application for Leave to Supplement the Record" and an "*Ex Parte* Application for Leave to Supplement the Record Regarding Claim Construction Hearing." (Dkt. Nos. 539, 555.) The Court GRANTS the motions to the extent that IDSI seeks to supplement the record, and has considered IDSI's supplemental documents. However, finding it unnecessary, the Court DENIES IDSI's request to submit additional supplemental briefing. In addition, to lessen prejudice to Zest due to IDSI's untimely filing, the Court has also considered Zest's responses in opposition to IDSI's motions for leave to supplement the record. (Dkt. Nos. 542, 556-57.)

[2]The Parties have filed separate motions concerning Defendants' liability for conduct occurring after December 31, 2010. (*See* Dkt. Nos. 456, 467, 468.)

Testimony of Dr. Susan Schwartz McDonald, (Dkt. No. 444); (2) DENIES
WITHOUT PREJUDICE Implant Direct's Motion to Exclude the Expert Witness
Testimony of Dr. Robert C. Vogel, (Dkt. No. 450); (3) GRANTS in part and
DENIES in part the IDSI Defendants' Omnibus Motions for Judgment on the
Pleadings and for Summary Judgment, (Dkt. No. 475); and (4) GRANTS in part and
DENIES in part the Implant Direct Defendants' Motions for Partial Summary
Judgment and to Amend Invalidity Contentions, (Dkt. No. 478).

## FACTUAL BACKGROUND

As set forth in prior orders in this case, this is a patent and trademark
infringement action involving dental attachment products. (*See* Dkt. Nos. 1, 13.)
The gravamen of the First Amended Complaint ("FAC") is that Implant Direct
manufactures, offers for sale, and sells the "GoDirect" dental attachment product
and the GoDirect Prosthetic System ("GPS") (collectively, "Accused Products") in
violation of Zest's patents and falsely and unfairly uses the ZEST® and LOCATOR®
trademarks when marketing the Accused Products. (*See* Dkt. No. 13 ¶¶ 6, 7, 20, 21,
24-28, 30-32.)

## I.      Zest's Patents and Trademarks

The patents at issue in this case are U.S. Patent No. 6,030,219 ("the '219
Patent") and U.S. Patent No. 6,299,447 ("the '447 Patent"). (*Id.* ¶¶ 12-13; *Id.* Exs.
A, B.) Issued on February 29, 2000, the '219 Patent relates to a dental attachment
assembly comprising of: (1) an abutment member for attachment to a tooth root,
implant, or adjacent tooth; (2) a male member for hinged engagement in a; (3) cap
secured in a dental appliance. (*Id.* Ex. A, '219 Patent at 1.). Zest's most recently
amended infringement contentions, dated July 25, 2012, contend that Implant Direct
infringes claims 1-5, 7, 10-14, and 21-26 of the '219 Patent. (Dkt. No. 475-4, Chin
Decl. Ex. 1 at 1.)

The '447 Patent was filed as a "continuation-in-part of the application that led
to the '219 [P]atent" and was issued on October 9, 2001. (Dkt. No. 494-1 at 4.) As

1   described by Zest, the '447 Patent shares much of the same patent specification as

2   the '219 Patent, but includes patent claims directed towards "other features of the

3   . . . dental attachment assembly, including additional means for attaching and

4   securing the different parts in the multi-component system." (*Id.*) Zest's most

5   recently amended infringement contentions contend that Implant Direct infringes

6   claims 1-2, 4-6, 8-9, 13-14, and 19 of the '447 Patent. (Dkt. No. 475-4, Chin Decl.

7   Ex. 1 at 1.)

8   　　　　Zest makes and has sold the Locator® overdenture attachment system

9   described and claimed in the '219 and '447 Patents. (Dkt. No. 13, FAC ¶¶ 11-12.)

10  Zest has registered trademark rights for the Zest® and Locator® marks as U.S.

11  Registration 989,049; U.S. Registration 1,251,485; and U.S. Registration No.

12  2,559,602. (*Id.* ¶¶ 14-16 and Exs. C, D.) Zest's Locator® overdenture attachment

13  system consists of three parts, sold separately: (1) the "abutment," also described in

14  this litigation as the "female"; (2) the "liner," also described in this litigation as the

15  "male"; and (3) a "cap."

16  **II.    Relationship Between the Parties**

17  　　　　Between January 1, 2008 and May 27, 2010, Zest and Implant Direct

18  maintained a distributorship relationship. (*Id.* ¶ 22; *see also* Dkt. No. 529-8, Dugger

19  Decl. Ex. 13, Distribution Agreement.) Under the terms of the Parties' distribution

20  agreement ("Distribution Agreement"), Zest granted Implant Direct a "non-

21  exclusive right . . . to purchase, market and distribute 'Locator Abutments'

22  manufactured by Zest" for use on specific Implant Direct implants. (Dkt. No. 259-8

23  at Zest 001736.) Zest also granted a non-exclusive right to Implant Direct "to

24  purchase, market and distribute ancillary products (the 'Locator Attachments'), for

25  sale and distribution throughout the world." (*Id.*) Zest accordingly designed

26  Locator® abutments for Implant Direct implants to be sold by Implant Direct. (*See*

27  Dkt. Nos. 550, 550-1, Velez Decl. Exs. 2, 3.)

28  　　　　While Implant Direct served as a distributor of Zest Locator® abutments and

attachments, the President and CEO of Implant Direct, Dr. Gerald Niznick ("Dr. Niznick"), began designing a product later marketed and sold as the "GoDirect" implant. The GoDirect product line "copied the geometry of the Locator abutment attachment surface." (Dkt. No. 475-1 at 4.) Specifically, Dr. Niznick testified that he instructed Ines Aravena, an Implant Direct engineer, to "reverse-engineer . . . from the Zest locator abutment" to create the "top part" of the GoDirect implant. (Dkt. No. 493-5, Velez Decl. Ex. 7, May 11, 2012 Niznick Depo. at 89:17-90:9.) Dr. Niznick testified Implant Direct then created the bottom of the GoDirect implant by "mat[ing the reverse-engineered top] with the bottom of, say, [an existing Implant Direct implant] and decid[ing] how I want[ed] the neck." (*Id.* at 90:11-17.) Implant Direct then "added certain features to it." (*Id.* at 90:20.)

Zest learned that Implant Direct was developing the GoDirect product in August 2008, and in a series of letters Zest threatened to sue for patent infringement if Implant Direct made a "one-piece Locator Attachment Mini Implant without the permission of Zest Anchors, Inc." (Dkt. No. 494-2, Velez Decl. Exs. 9, 10.) Implant Direct continued design of the GoDirect implant, conducting tests on the implant through 2008, (Dkt. No. 550-3, Velez Decl. Ex. 13) (internal Implant Direct memorandum documenting equivalence between Zest's Locator abutment attachment features and the GoDirect implant features), beginning to market the product as early as late 2008, and offering the GoDirect implant for sale in 2009. (Dkt. No. 13 ¶ 20, Ex. E at 2). Implant Direct has marketed the GoDirect implant as "compatible" with Zest's Locator® attachment system; in other words, as usable in conjunction with Zest's Locator® liner and cap. For example, a July 2009 Implant Direct newsletter states:

**GoDirect - Locator® Attachment Compatible Implant**
The GoDirect 1-piece implant includes a snap-on plastic transfer and comfort cap. The Locator® Attachment, consisting of a metal housing and a selection of plastic retentive caps can be purchased from Implant Direct or directly from Zest Anchor Company. The GoDirect implant, transfer and comfort cap will cost just $150 . . .

1  (Dkt. No. 13 Ex. E at 2) (emphasis in original).

2      Between March and April 2010, Zest terminated the Distribution Agreement

3  with Implant Direct and filed the instant suit against Implant Direct. (Dkt. No. 494-

4  4, Velez Decl. Ex. 18; *see also* Dkt. No. 1.) Dr. Niznick then "designed and went to

5  market with Implant Direct's own GPS abutments, liners, and caps that fit the non-

6  patented geometry of the Locator abutment attachment surface." (Dkt. No. 475-1 at

7  5.) An Implant Direct engineer, Ines Aravena, testified that the Zest Locator

8  abutment, GoDirect implant, and GPS abutments have the same dimensions and

9  shape. (Dkt. No. 494-4, Velez Decl. Ex. 21 at 92:4-93:20.) On August 27, 2010,

10  Zest filed a First Amended Complaint in the present action, including allegations

11  regarding Implant Direct's GPS system. (Dkt. No. 13.)

12      Effective December 31, 2010, the Implant Direct entities transferred all their

13  assets to newly-created IDSI entities, and effectively ceased operations. (*See* Dkt.

14  No. 521, Velez Decl. Ex. 1.) IDSI has continued sales of the Accused Products, and

15  released a revised version of the GPS male liner (called "GPS internal male" by the

16  Parties), after January 1, 2011.

17                        **PROCEDURAL BACKGROUND**

18      As set forth above, on March 12, 2010, Zest filed the initial Complaint in the

19  present action, naming Defendants Implant Direct International, Implant Direct

20  LLC, and Implant Direct MFG, LLC. (Dkt. No. 1.) On August 27, 2010, Zest filed a

21  First Amended Complaint ("FAC"), the current operative Complaint. (Dkt. No. 13.)

22  The FAC alleges eight causes of action against the Implant Direct Defendants:

23  (1) Infringement of U.S. Patent No. 6,030,219; (2) Infringement of Patent No.

24  6,299,447; (3) Trademark Infringement; (4) False Designation of Origin; (5) False

25  Advertising; (6) California Unfair Competition Law ("UCL"); (7) California

26  statutory False Advertising Law; and (8) Common Law Unfair Competition. (*Id.*)

27  **I.**    **Affirmative Defenses**

28      On September 17, 2010, Implant Direct filed an Answer to Plaintiffs' First

Amended Complaint. (Dkt. No. 17.) Defendants' Answer claimed the affirmative defenses of: (1) non-infringement; (2) no inducement; (3) invalidity under 35 U.S.C. §§ 102 and/or 103; (4) invalidity under 35 U.S.C. § 112, first paragraph; (5) invalidity under 35 U.S.C. § 112, second paragraph; (6) prosecution history estoppel; and (7) unenforceability. (*Id.* at 9-11.) On December 9, 2010, U.S. Magistrate Judge William V. Gallo entered a case management conference order setting a March 14, 2011 deadline for any motions to amend the pleadings. (Dkt. No. 27 at 1.) On May 19, 2011, Defendants filed a motion to amend the Answer to assert a counterclaim against Plaintiffs for declaratory judgment of invalidity as to U.S. Patent No. 6,299,447. (Dkt. No. 32.) On January 20, 2012, U.S. District Judge Larry Alan Burns denied Defendants' motion due to Defendants' failure to show diligence in seeking to amend the Answer. (Dkt. No. 81 at 4) (finding a lack of diligence because Defendants sought to amend the Answer two months after the deadline and took eight months to conduct a prior art search after learning new information).

On September 11, 2013, Implant Direct filed a Motion to "Clarify That It May Assert Patent Exhaustion and Implied License at Trial, or in the Alternative, for Leave to Amend Answer to Assert Patent Exhaustion and Implied License as Defenses." (Dkt. No. 282.) On January 8, 2014, this Court denied Implant Direct's motion to clarify and denied leave for Implant Direct to amend its Answer. (Dkt. No. 331.) Specifically, the Court found that Implant Direct's Answer had not raised either patent exhaustion or implied license, and that Implant Direct had failed to show good cause to modify the scheduling order in order to untimely amend its Answer. (*Id.*)

## II.     Discovery and Spoliation of Evidence

Zest filed a motion for spoliation and discovery abuse sanctions against Implant Direct on August 27, 2012. (Dkt. No. 121.) Magistrate Judge Gallo held two hearings on the motion, on October 19, 2012 and on May 29, 2013. (Dkt. Nos.

145, 228.) On November 25, 2013, Judge Gallo issued an Order: (1) granting in part and denying in part Zest's motion for spoliation and discovery abuse sanctions; and (2) recommending an adverse jury instruction at trial. Specifically, Judge Gallo made the following factual findings and conclusions of law: (1) Defendants' duty to preserve documents arose on October 22, 2008, when Plaintiffs notified Defendants of a potential lawsuit against Defendants should Defendants decide to market their allegedly infringing product, (Dkt. No. 312 at 13); (2) Defendants failed to implement a "litigation hold or document preservation policy on October 22, 2008, or at any time before the Complaint was filed, or after the Complaint was filed," (*id.* at 4); (3) Defendants spoliated two categories of documents - the emails of Ines Aravena and Gerald Niznick, (*id.* at 13-14); (4) an adverse inference jury instruction was warranted; and (5) monetary sanctions were warranted.

Implant Direct filed objections to Judge Gallo's order and recommendation. (Dkt. No. 372.) On June 16, 2014, this Court overruled Implant Direct's objections and, after conducting a *de novo* review, found that at least two Implant Direct employees despoiled evidence after a duty to preserve evidence arose in this case. (Dkt. No. 440 at 22.) In addition, the Court found that Zest suffered prejudice from Implant Direct's spoliation of evidence "at least as to evidence related to Dr. Niznick's communications with third parties over combining the GoDirect product with Zest products and to communications between Dr. Niznick and Ms. Aravena [the Implant Direct and IDSI engineer that worked with Dr. Niznick to design the Accused Products] over the development of the GoDirect implant." (*Id*. at 26.) The Court granted Zest an adverse jury instruction sanction against Implant Direct, the precise language of which will be determined at trial. (*Id.*)

### III.   Joinder of IDSI

Under the terms of a transaction agreement dated November 17, 2010 ("Transaction Agreement"), Implant Direct entered into a corporate transaction with Sybron Canada Holdings, Inc. for an "arms-length" sale whereby the Implant Direct

entities formed and transferred 100% of their interests into wholly-owned subsidiaries, which were then purchased by Sybron Canada Holdings, Inc. ("Sybron"). (*See* Dkt. No. 521, Velez Decl. Ex. 1.) In particular, Implant Direct Mfg. LLC became Implant Direct Sybron Manufacturing, LLC and Implant Direct International became Implant Direct Sybron International LLC. (*See* Dkt. No. 146 at 4; Dkt. No. 521-2, Velez Decl. Ex. 3, Chang Depo. at 69:20-70:4.)

Following a series of discovery disputes between the Parties, Zest filed a motion to formally join the IDSI entities to the present action as successors-in-interest to the Implant Direct entities pursuant to Federal Rule of Civil Procedure 25(c). (Dkt. No. 116.) After holding a hearing on the propriety of joinder, (Dkt. No. 184, Hearing Transcr.), this Court denied Zest's motion to join the IDSI entities on the ground that Zest had not properly served IDSI with the motion. (Dkt. No. 185.) The Court further granted Plaintiffs fifteen days to properly effectuate service and took the motion under submission. (Dkt. No. 185.) On February 19, 2013, the IDSI entities filed an opposition to Plaintiffs' motion to join. (Dkt. No. 190.) On April 15, 2013, this Court issued an order granting Zest's motion to join the IDSI entities as successors-in-interest to Implant Direct. (Dkt. No. 202.) In particular, this Court found that the benefits of joinder outweighed Plaintiffs' delay in seeking joinder and that IDSI was not unduly prejudiced because "IDSI has had an opportunity as an interested party to influence the direction that Implant Direct has sought in the litigation up to this point." (*Id.* at 4-6.)

On May 6, 2013, without seeking leave to do so, the IDSI entities filed an Answer to Plaintiffs' Amended Complaint, asserting a counterclaim against Plaintiffs for patent invalidity and asserting the affirmative defenses of patent exhaustion and implied license, among others. (Dkt. No. 211.) On May 31, 2013, Zest filed a motion to strike IDSI's Answer and Counterclaim arguing that IDSI was attempting to file the very same Answer and Counterclaim that Implant Direct was previously disallowed by Judge Larry Burns to file, (*see* Dkt. No. 81), and that

IDSI, as a successor-in-interest to Implant Direct, was not entitled to start the case anew under Rule 25(c). (Dkt. No. 226, 226-1.) On October 16, 2013, this Court granted Zest's motion to strike IDSI's answer and counterclaim. (Dkt No. 301 at 4-10.) This Court has since held that IDSI, as successor-in-interest to Implant Direct, is bound to this Court's orders and Implant Direct's litigation decisions in this case. (Dkt. No. 558.)

**IV.   Claim Construction**

On April 10, 2012, Judge Larry Alan Burns presided over the claim construction ("*Markman*") hearing in this case. (Dkt. No. 88; *see also* Dkt. No. 543, Hearing Transcr.) The Parties briefed and argued four sets of claim terms in the '219 and '447 Patents for construction: (1) "s wivel" and "swivel engagement"; (2) "cavity"; (3) "snap engagement"; and (4) "predetermined angle." Following the Parties' presentations and Judge Burns' comments at the *Markman* hearing, Implant Direct withdrew its request that Judge Burns construe the second through fourth claim terms, agreeing "with Zest's suggestion that these terms do not require construction, and that the plain and ordinary meaning of the claim language should apply." (Dkt. No. 91-2 at 2.)

Judge Burns' Order Following *Markman* Hearing accordingly construed only the "swivel" and "swivel engagement" claim terms found in Claims 1, 21, 22, and 23 of the '219 Patent. (Dkt. No. 99.) Judge Burns construed "swivel joint" and "swivel engagement" as "a rotational or hinging connection between the male member and the cap, in which the rotational or hinging motion is around one or more axis." (*Id.* at 20.) Judge Burns further ordered that "swiveling" be construed as "any rotational movement or hinging action between the male member and the cap, around one or more axis" whereby "rotational movement" and "hinging action" are not both required. (*Id.*)

**V.   Present Motions**

The Parties have filed cross-motions for summary judgment as to Zest's

[10cv541-GPC(WVG)]

allegations relating to conduct occurring after the transfer between Implant Direct and IDSI. The Court has ruled on those motions separately. (Dkt. No. 558.) At issue in the present omnibus motions is Defendants' liability for Zest's allegations related to Implant Direct's conduct prior to January 1, 2011. (Dkt. Nos. 475, 478.) In addition, IDSI has filed a motion to exclude the report and testimony of Dr. Susan Schwartz McDonald, Zest's trademark infringement expert. (Dkt. No. 444), to which Implant Direct has filed a notice of joinder, (Dkt. No. 472). Implant Direct has also filed a motion to exclude the report of Dr. Robert C. Vogel, Zest's indirect patent infringement expert. (Dkt. No. 450.)

**LEGAL STANDARD**

**I.    Summary Judgment**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

"Summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). For a defendant seeking summary judgment of non-infringement, "nothing more is required than the filing of a ... motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused [products] did not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006).

To infringe a patent claim, the accused product or process must incorporate each and every limitation of the claim. *See Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2013) (citing *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1348 (Fed. Cir. 2013)). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013)."[S]ummary judgment of noninfringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Id*. at 1304. "Whether a claim is infringed under the doctrine of equivalents may be

1   decided on summary judgment if no reasonable jury could determine that the

2   limitation and the element at issue are equivalent." *Zelinski v. Brunswick Corp.*, 185

3   F.3d 1311, 1317 (Fed. Cir. 1999) (citing *Warner-Jenkinson Co. v. Hilton Davis*

4   *Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)).

5   **II.      Judgment on the Pleadings**

6          Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough

7   not to delay trial – a party may move for judgment on the pleadings." When

8   deciding a Rule 12(c) motion, "the allegations of the nonmoving party must be

9   accepted as true, while the allegations of the moving party which have been denied

10  are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*,

11  896 F.2d 1542, 1550 (9th Cir. 1989). The court construes all material allegations in

12  the light most favorable to the non-moving party. *Deveraturda v. Globe Aviation*

13  *Sec. Servs.*, 454 F.3d 1043, 1046 (9th Cir. 2006). Furthermore, judgment on the

14  pleadings is proper when the moving party clearly establishes on the face of the

15  pleadings that no material issue of fact remains to be resolved and that it is entitled

16  to judgment as a matter of law. *Hal Roach Studios*, 896 F.2d at 1550.

17         Documents attached to, incorporated by reference in, or integral to the

18  complaint may be properly considered under Rule 12(c) without converting the

19  motion into one for summary judgment. *Rose v. Chase Manhattan Bank USA*, 396

20  F.Supp.2d 1116, 1119 (C.D. Cal. 2005). However, judgment on the pleadings is

21  improper when the district court goes beyond the pleadings to resolve an issue; such

22  a proceeding must properly be treated as a motion for summary judgment. *Hal*

23  *Roach Studios*, 896 F.2d at 1550.

24                              **DISCUSSION**

25  **I.      IDSI's Omnibus Motion for Summary Judgment/Judgment on the**

26          **Pleadings**

27         IDSI moves for summary judgment on Zest's patent claims, and for

28  "judgment on the pleadings" as to Zest's remaining claims for trademark

infringement, false designation of origin, and violation of federal and state false advertising laws.

### A.   Zest's Procedural Arguments

As an initial matter, the Court notes three procedural arguments raised by Zest that apply to IDSI's motion as a whole: (1) that IDSI's motion relies on the unsworn expert report of Dr. Niznick as well as unauthenticated documents; (2) that IDSI's reliance on Dr. Niznick's testimony precludes summary judgment because Dr. Niznick is biased due to his financial interest in the outcome of this litigation and because Dr. Niznick has credibility issues; and (3) the Court granted Zest an adverse inference jury instruction stemming from the spoliation of evidence by IDSI employees, which entitles Zest to argue to the jury that IDSI destroyed documents that would have proven Zest's claims.

Although the Court has noted these arguments, and they are well taken, these procedural issues do not defeat summary judgment in this case. In particular, the Court finds that although IDSI uses Dr. Niznick's report and testimony to support its motion, the motion primarily focuses on the adequacy of Zest's infringement theories. Furthermore, while the Court did award Zest an adverse jury instruction due to Implant Direct's spoliation of evidence, a spoliation of evidence finding does not allow a party who has produced no evidence in support of a claim to survive summary judgment on that claim. *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998). Accordingly, the Court turns to IDSI's arguments for summary judgment and judgment on the pleadings on each of the causes of action alleged against Implant Direct for pre-2010 Transaction conduct.

### B.   Patent Infringement Claims

Zest's Amended Complaint advances theories of: (1) direct patent infringement; (2) induced and contributory patent infringement; and (3) willful patent infringement entitling Zest to enhanced damages. IDSI seeks summary

1   judgment on all three theories as they relate to pre-acquisition components.[3]

2       Summary judgment of noninfringement is a two-step analysis. "First, the

3   claims of the patent must be construed to determine their scope. Second, a

4   determination must be made as to whether the properly construed claims read on

5   the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298,

6   1304 (Fed. Cir. 1999) (internal citation omitted)..

7       As to the first step, Zest alleges Implant Direct's GoDirect implant product

8   and the pre-acquisition GPS products directly infringe the '219 Patent both literally

9   and by the doctrine of equivalents.  The remaining independent claims of the '219

10  Patent, claims 1 and 22, require three additional claim limitations which IDSI

11  asserts are not present in the GPS design: (1) a releasable snap engagement between

12  the male member and the cap, (2) "rounded," "convex," and "concave" shapes of the

13  external walls of the male liner and interior walls of the cap, and (3) a "swivel joint"

14  between the liner and cap.  (Dkt. No. 475-1 at 7.)

15      IDSI argues Zest's patent infringement expert, Dr. Brunski, has offered "late,

16  absurd constructions of several claims limitations." IDSI's motion attacks Dr.

17  Brunski's opinions as to how Implant Direct's GPS liner product has a "releasable

18  snap engagement"; how the GPS liner is "rounded"; how the walls of the GPS liners

19  and caps are either "convex" or "concave," and argues that Dr. Brunski's opinion

20  departs from Judge Burns' construction of a "swivel joint" at the *Markman* hearing

21  in this case. In light of its disagreement regarding Dr. Brunski's opinions, IDSI

22  argues: (1) that the Court has a duty to resolve any claim construction disputes as a

23  matter of law, right up to the time of jury deliberations, and the Court should reject

24  Dr. Brunski's "late constructions"; or (2) in the alternative, if the Court adopts

25  Zest's "absurd claim constructions," those claim constructions render Zest's patents

26

27      [3] After the November 2010 acquisition of Implant Direct, IDSI released a revised

28  version of the GPS male liner (called "GPS internal male" by the Parties) in January 2011. IDSI's motion for summary judgment focuses on the pre-acquisition components and does not include the GPS internal male in its motion.

invalid as indefinite.

The Court addresses each of the three "constructions" attacked by IDSI, then addresses IDSI's argument related to invalidity. In addition, the Court briefly addresses IDSI's argument regarding the doctrine of equivalents.

### 1. Direct Infringement

#### a. Pre-Acquisition Male Liners

IDSI argues that combinations that include the pre-acquisition liner do not infringe the '447 Patent or independent claims 21 and 23 of the '219 Patent. (Dkt. No. 475-1 at 22.) IDSI asserts that these claims require both internal and external snap engagements between the male member and the abutment and that the pre-acquisition liner lacks the required internal snap engagement. Zest responds that the issue is moot because it does not contend that the original pre-acquisition GPS male liner infringes any claim requiring an inner and outer snap engagement between the male and abutment. (Dkt. No. 494-1 at 18.)

The infringement claim was not withdrawn by Zest and, as such, requires a determination.  In view of the lack of opposition to the motion, the Court finds that the combinations that include the pre-acquisition liner do not infringe any claims of the '447 Patent and asserted claims 21 and 23 (and its dependent claims 24-25) of the '219 Patent.

#### b. Releasable Snap Engagement

IDSI argues that combinations that include the GPS pre-acquisition liner and caps do not infringe independent claim 1 (and dependent claims 2,3,4,7,10, 12, 13 and 14) and independent claim 22 of the '219 Patent because each of the claims requires a "releasable snap engagement." (Dkt. No. 475-1 at 11.)

Zest's infringement contentions include an assertion that the combination of the GPS pre-acquisition liner and cap infringe independent claims 1 and 2 of the '219 Patent. In order for the GPS liner and cap to infringe these claims, there must be a "releasable snap engagement" between the GPS male liners and caps. At the

claim construction hearing before Judge Burns, Implant Direct proposed that the Court should construe "releasable snap engagement" (in relation to claim 2 of the '219 Patent) to mean "that the retention head comes into direct contact with the socket and is physically held in place due to the contact between the two parts." (Dkt. No. 38 at 5.) Zest took the position that no construction was necessary, but that "releasable snap engagement" meant that "the engagement must allow for freedom of movement." (*Id.*) Implant Direct later withdrew its request that the Court construe the terms "cavity," "snap engagement," and "predetermined angle." (Dkt. No. 91-2 at 2.) Accordingly, the term "releasable snap engagement" should be given its plain, ordinary meaning.

Proper construction turns on the "ordinary and accustomed meaning" of the claim term "as understood by one of ordinary skill in the art." *See, e.g.*, *Hockerson-Halberstadt v. Avia Group Int'l*, 222 F.3d 951, 955 (Fed. Cir. 2000) (citing cases). Dr. Brunski has opined that a person of "ordinary skill in the art" relevant to the '219 and '447 Patents is a general dentist, a dental specialist, or a trained dental technician working under the guidance of a dentist, or an individual with a bachelor's degree in biomechanical engineering, mechanical engineering, materials engineering or related discipline with a similar level of experience in the field of dental attachments. (Dkt. No. 529-1 at 5-6.)

As to "releasable snap engagement," the Court will begin its analysis by examining the dictionary meaning of the terms in conjunction with a plain reading of the intrinsic evidence. *See Tex. Digital Sys., Inc. v. Telegenix, Inc*., 308 F.3d 1193, 1205 (Fed. Cir. 2002) ("By examining relevant dictionaries, encyclopedias and treatises to ascertain possible meanings that would have been attributed to the words of the claims by those skilled in the art, and by further utilizing the intrinsic record to select from those possible meanings the one or ones most consistent with the use of the words by the inventor, the full breadth of the limitations intended by the inventor will be more accurately determined and the improper importation of

[10cv541-GPC(WVG)]

1  unintended limitations from the written description into the claims will be more

2  easily avoided."); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d

3  1313, 1344-45 (Fed. Cir. 2003) (looking to non-technical dictionary for ordinary

4  meaning of claim term "including"); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d

5  1336, 1344 (Fed. Cir. 2001) (using Random House Unabridged Dictionary to define

6  the ordinary meaning of "portion").

7      Based on the dictionary definition, the word "releasable" ordinarily means, as

8  an adjective, "that can be released" and "intended or configured to release."

9  American Heritage Dictionary, Fourth Edition (2000). "Release" means to "[t]o set

10  free from confinement, restraint or bondage, to free from something that binds,

11  fastens or holds back."  *Id.* As to "snap", the term has numerous definitions.  The

12  dictionary definition of "snap," which ISDI relies on, is "a clasp, catch or other

13  fastening device that operates with a snapping sound." *Id.*  In addition, "snap" is

14  defined as "the sudden release of something held under pressure or tension." *Id*.

15  Meanwhile, "engagement" is defined as the "act of engaging or state of being

16  engaged" while "engage" is defined as "to interlock or cause to interlock." *Id*.

17      "Claims must be read in view of the specification, of which they are a

18  part. . . . For claim construction purposes, the description may act as a sort of

19  dictionary, which explains the invention and may define terms used in the claims."

20  *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc),

21  *aff'd*, 517 U.S. 370 (1996); *see also Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,

22  75 F.3d 1545, 1550 (Fed. Cir. 1996) ("[A] claim interpretation that would exclude

23  the inventor's device is rarely the correct interpretation; such an interpretation

24  requires highly persuasive evidentiary support . . . ."); *Hoechst Celanese Corp. v.*

25  *BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("We share the district court's

26  view that it is unlikely that an inventor would define the invention in a way that

27  excluded the preferred embodiment, or that persons of skill in this field would read

28  the specification in such a way.").  "However, in looking to the specification to

construe claim terms, care must be taken to avoid reading 'limitations appearing in the specification . . . into [the] claims.'" *Interactive Gift Exp., Inc. v. Compuserve Inc*., 256 F.3d 1323, 331 (Fed. Cir. 2001) (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc*., 887 F.2d 1050, 1053 (Fed. Cir. 1989)).

IDSI raises two arguments against Dr. Brunski's opinion that there is a releasable snap engagement between the original GPS male liners and caps. IDSI first argues Implant Direct did not design the male liner to form a "releasable snap engagement" with the cap. It designed its liner to lock into place in the cap permanently. The liner then can only be removed using a special tool in a process that destroys the liner. (Dkt. No. 475-1 at 11) (citing Niznick Rpt. at 18; Niznick Dep. at 195:11-20). Relying on dictionary definitions and the specification, IDSI claims that "releasable snap engagement" is a "fastening device that operates with a snapping sound to bring something into an interlocked state from which it can then be freed with another snap." IDSI argues the Court must resolve any differing claim constructions prior to giving this case to a jury.

In opposition, Zest argues that Dr. Brunski's opinions flow from the claim language. Dr. Brunski opines that the '219 claims language provides that the snap engagement must be releasable and provide for freedom of movement between the male member and the abutment. (Dkt. No. 550-1 at 11.) Dr. Brunski continues that the '219 claims similarly provide for freedom of movement between the male member and the cap. (*Id*. at 12.) As characterized by Zest, "Dr. Brunski opined that there is a releasable snap engagement between the male and cap even if a tool is necessary to remove the male and even if removal could potentially destroy the male." (Dkt. No. 494-1 at 20.) Zest argues nothing in the claim language requires the liner to be reusable, and that reliance on dictionary definitions is improper because the claim language is clear that "reusable" is not a limitation in any of the claims.

IDSI's second argument against Dr. Brunski's opinion is that "Dr. Brunski

[10cv541-GPC(WVG)]

used the term releasable snap engagement to mean two different things depending on which attachment to the male liner it referred to." (Dkt. No. 475-1 at 28-29) (citing Brunski Depo. 172:7-24). IDSI argues that if the Court were to accept application of the phrase "releasable snap engagement" to include both the engagement between the liner and abutment designed to be taken off thousands of times, and to the engagement between the liner and cap which can only be separated once with the force of a special tool, destroying the liner in the process, then Zest's patents are fatally invalid.  (*Id.* at 26.)

As to the second argument, Zest replies that the '219 Patent specification teaches that a "releasable snap engagement" is an engagement that allows the components to be separated and that the teaching applies to both the connection between the male liner and abutment and between the male and the cap, even if those connections do not work in exactly the same way. (Dkt. No. 494-1 at 26.)

"Releasable" as used in the '219 Patent should be given its plain, ordinary meaning, which is that the components are capable of being released from one another. Nothing in the claims, specification or prosecution history discloses that "releasable" requires the freeing of the male liner from both the abutment and cap without destroying the liner. The fact that an embodiment of the patented device provided for releasability and reusability of a component does not limit "releasability" to require reuse of the released component. In this case, Dr. Brunski has opined that the components of the GPS system are "releasable." (Dkt. No. 529-1 at 18.) The Court agrees with Zest that "releasable snap engagement" applies to both the engagement between the male liner and abutment, and the engagement between the male liner and cap.  The application of this term to both forms of engagement is not inconsistent and does not render the patents fatally invalid.

As to term "snap" as used in the patents, there is nothing that supports IDSI's argument that a snapping sound during release is required. Rather, the claim language along with the specifications and prior art make it clear that "snap" means

"the sudden release of something held under pressure or tension." In this case, Zest has offered sufficient evidence that the GPS components provide for "releasable snap engagement" to create a genuine issue of fact. The Court finds that IDSI has failed to establish that this claim limitation is absent from the GPS liner and cap. The Motion for Summary Judgment based on this limitation is DENIED.

### c.   Rounded, Convex, and Concave Liner and Cap

In order for the GPS pre-acquisition liner and cap to infringe independent claims 1 and 2 of the '219 Patent, the outer "skirt" surface of the liner and the inner surface of the cap must have "rounded" surfaces. The male liner's skirt must have a "rounded, convex out surface" and the inner surface of the cap must have a "rounded, concave inner surface." (*See* Dkt. No. 13-1, Ex. A at 13:51-58, 5:55-65.) The Parties agreed during the *Markman* claim construction proceedings that the terms "rounded," "convex," and "concave" would be given their plain, ordinary meanings.

### 1.   The Liner

In Zest's patent specification, the tops of the liners are flat, and the "skirt" of the liner falls from the flat top in a continuous bell-like or skirt-like shape. Implant Direct's pre-acquisition GPS liner also has a flat top, but there is a notch at the top of the "skirt" and the sides (below the notch) fall basically straight down vertically. Zest's expert, Dr. Brunski, opines that the original GPS male has a "rounded, convex outer surface" by taking photographs of physical samples and taking measurements of the samples from the photographs. (Dkt. No. 494-1 at 24) (citing Dkt No. 478-2, Ex. 1 at Ex. 13, filed under seal at Dkt. No. 529-1).

According to IDSI, the "plain, ordinary meaning of rounded and convex or concave shapes is an essentially *continuous* curve in the same shape, not a series of different shapes. Merriam-Webster defines 'rounded' as 'having a round or curving shape,' 'flowing rather than jagged or angular.'" (Dkt. No. 475-1 at 17) (quoting Chin Decl. Ex. 15). IDSI argues that the GPS liner has a "notch" at the top of the

skirt that the '219 specifications do not have. As a result, IDSI argues Dr. Brunski improperly begins his measurements at the lowest point in the notch rather than what IDSI considers the top of the skirt. An illustration of this is in Zest's brief. (Dkt. No. 494-1 at 24.) Zest outlines in yellow what Dr. Brunski measured as the "skirt" – IDSI says instead that the "skirt" includes the top portion that juts out, which would prevent the entire skirt as a whole from being considered "rounded" or "convex."

Zest relies upon Dr. Brunski's conclusion that the original GPS male has a skirt with a rounded, convex surface. (Dkt. No. 494-1 at 24.) Dr. Brunski analyzed the the shape of the subject GPS male skirt by taking photographs of physical samples and taking measurements of the samples from the photographs. (Dkt. No. 529-1, Ex. 13.) Zest argues that Claims 1 and 22 only require a "rounded" skirt and not a skirt that is round like a circle. (Dkt. No. 494-1 at 32.)

## 2.    The Cap

Independent claims 1 and 22 from the '219 Patent require the inner surface of the cap to have "rounded" and "convex" surfaces. (Dkt. No. 475-1 at 16.) IDSI asserts that this claim limitation requires that the shape of the inner side of the cap be concave like a bowl capable of holding water. (*Id.*) IDSI points to Dr. Brunski's deposition testimony that the inner surface of the Implant Direct cap would not hold water in most portions. (Dr. Brunski Dep. 354:24-357:20.) IDSI argues that the GPS cap lacks a concave, rounded cavity as provided by the '219 Patent. IDSI points out that Implant Direct designed the external side surfaces of its liner with ridges to fit into matching grooves in the interior sides of the GPS metal caps.

Zest's reply relies on Dr. Brunski's analysis of the GPS cap which reveals, among other things, that the engineering specifications for the radius of curvature for the inner surface of the cavity is 0.002 inches. (Dkt. No. 529-1, Ex. 1.) Dr. Brunski's examination of the cap led to his opinion that the GPS cavity has a rounded, concave inner surface. (*Id.*) Dr. Brunski asserts in the alternative that the

1  GPS cap has a cavity with a rounded concave inner surface under the doctrine of

2  equivalents.  (*Id.*, Ex. 1 at 22.)

3        Ultimately, the Parties' experts disagree as to precise area of the skirt that

4  must be "rounded" or "convex" and whether the cap has a rounded cavity. This

5  disagreement is best left for the trier of fact to resolve. *Scripps Clinic & Research*

6  *Found. v. Genentech, Inc*., 927 F.2d 1565, 1578 (Fed. Cir. 1991) ("To the extent

7  that apparent inconsistencies among the [expert's] three declarations raise questions

8  of credibility and weight . . . they were improperly resolved on summary

9  judgment."); *see also Synthes USA, LLC v. Spinal Kinetics, Inc.,* No. C-09-01201

10  RMW, 2011 WL 11709387, at \*17 (N.D. Cal. Aug. 19, 2011).  Trial by document is

11  an inadequate substitute for trial with witnesses, who are subject to examination and

12  cross-examination in the presence of the decision-maker. *Sartor v. Arkansas*

13  *Natural Gas Corp*., 321 U.S. 620, 628 (1944).

14        The Court DENIES IDSI's Motion for Summary Judgment based upon the

15  "rounded, convex" and "rounded cavity" limitations finding a genuine issue of fact

16  for the jury to determine.

17          **d.   Swivel Joint**

18        IDSI also argues that combinations that include pre-acquisition liners and

19  caps do not infringe any of the independent claims of the '219 Patent because there

20  is no "swivel joint" between the GPS male liners and the caps. Judge Burns'

21  *Markman* order construed "swivel joint" as "a rotational or hinging connection

22  between the male member and the cap, in which the rotational or hinging motion is

23  around one or more axis." (Dkt. No. 99 at 18.) Judge Burns also found that "the

24  swivel terms only apply to the physical connection between the cap and the

25  retention member." (*Id.* at 20.)

26        IDSI argues the Implant Direct GPS liner product was designed so that it

27  would not move relative to the dental appliance (the cap). IDSI quotes Judge Burns'

28  *Markman* order for support, as well as deposition from Dr. Brunski acknowledging

1   that this was Dr. Niznick's probable intent in designing the GPS product. (Dkt. No.

2   475-1 at 22) (citing Dkt. No. 99 at 19; Brunski Depo. 257:9-18). In short, according

3   to IDSI, because Zest's '219 Patent requires a swivel joint between the liner and the

4   cap, and Dr. Niznick designed the GPS products so the liner would not move

5   relative to the cap, the GPS product cannot infringe Zest's patent.

6        The entirety of Dr. Brunski's opinion as to how the GPS cap and liner

7   literally contain a "swivel joint" states:

8        The connection between the original GPS male and GPS cap is a
         swivel joint, a connection that allows the male to rotate or hinge within
9        the cap. There are no features in the design of the original GPS male
         that would prevent it from rotating inside the GPS cap. (IDL 000073.)
10       Instructional videos made by Defendants show that the male is installed
         by rotating or hinging movement of the male inside the cap.
11       (www.implantdirect.com/us/popout/GoDirect_TeamApproach_HiQ2.ht
         m.) Once inside the cap, a small amount of torque can be applied to
12       rotate the original GPS male within the GPS cap. (Ex. 9; IDL
         002907-908; IDL 011904-905.) Additionally, finite element
13       simulations show that the original GPS male hinges relative to the GPS
         cap when it is lowered over the abutment member (Ex. 10), when snap
14       engaged onto an abutment member (Ex. 11), and when the cap is
         axially loaded (Ex. 12.).
15
   (Dkt. No. 529-1, Ex. 3 at 2.)
16
         IDSI argues Dr. Brunski sets forth "two creative, but absurd, ways around
17
   Implant Direct's non-infringing design." The first opinion IDSI disagrees with is
18
   that "a rotational or hinging connection" between the liners and caps is satisfied by
19
   the fact that the GPS liners and caps move slightly different distances in the same
20
   direction. (Dkt. No. 475-1 at 23.) This contention appears based on Dr. Brunski's
21
   deposition testimony that he "ran finite element analyses based on Implant Direct's
22
   engineering drawings and concluded that when the liner and cap were placed under
23
   pressure, the plastic liners would deform and separate from the metal cap in the
24
   microscopic range of 15-50 microns." (Dkt. No. 475-1 at 23) (citing Dkt. No. 533-1,
25
   Brunski Depo. at 253, 256). IDSI argues this is a new claim construction – that
26
   microscopic separation between the liner and the cap can constitute "swiveling."
27
         The Court finds that microscopic deformation produced by pressure on a
28
   resilient material, such as nylon, does not constitute a "swivel joint."  The

microscopic deformation or separation is incidental to the resilience of the material. Under Zest's theory any nylon male member coupled with a metal cap would qualify as a swivel joint. The Court concludes that Zest's theory either reconstructs the term "swiveling" in a manner that improperly expands the constructed term or forces the Accused Products to fit into the constructed term without any rational basis.

The second "swiveling" theory IDSI takes issue with is the theory that, "[u]sing only Implant Direct liners and caps attached together, without attaching the liners to an abutment, Dr. Brunski determined that it was theoretically possible to spin the liner slightly in the cap by applying torque." (Dkt. No. 475-1 at 23.) IDSI argues there is no evidence that this has actually happened in anyone's mouth, because Dr. Niznick has testified that it requires less torque to rotate the connection between the liner and the abutment than it does to rotate the liner and the cap – this means that when all three pieces are assembled, and torque is applied, any rotation would happen between the liner and the abutment before any rotation could occur between the liner and the cap. (*See id*. at 23-25) (citing Dr. Niznick's rebuttal report at 16-17).

Zest's opposition relies on Dr. Brunski's simulations which found that in use the male skirt moves or hinges relative to the cap which is consistent with the court's construction of a "swivel joint." (Dkt. No. 494-1 at 30.) In addition, Zest argues that the fact that Dr. Brunski measured the torque without attaching the male to an abutment is irrelevant because the claims at issue do not require the swiveling to occur while the male is in use. (*Id*.) The Court disagrees with a portion of Zest's position.

With respect to rotation outside of the mouth, it is true that neither the claims or specifications specify that swiveling must occur while the male is in use. However, as recognized in *White v. Dunbar*, 119 U.S. 47, 51-52 (1886):

> The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the

1   purpose of changing it, and making it different from what it is. The claim is a
2   statutory requirement, prescribed for the very purpose of making the patentee
    define precisely what his invention is; and it is unjust to the public, as well as
3   an evasion of the law, to construe it in a manner different from the plain
    import of its terms.

4   As to context, Dr. Brunski has recognized that the '219 Patent provides for

5   rotational or hinging connection in the swivel joint which allows for freedom of

6   movement between the male and the cap in order to reduce wear and loosening of

7   the attachment. (Dkt. No. 529-1 at 13.) It is plain that reducing wear and protection

8   against loosening of the attachment can only occur when the male and cap are in use

9   in the mouth.  Thus, it is implicit that swiveling of the male/cap must occur in the

10  mouth.

11  Zest's argument that swiveling can occur outside the user's mouth would

12  ignore the stated purpose of the invention. To the extent that Zest argues that

13  rotation can occur when the Accused Products are outside of the mouth, the Court

14  finds that such a construction is illogical and does not create a genuine issue of fact.

15  However, while Dr. Brunski did not conduct the rotation tests within the mouth, he

16  testified that rotation within the mouth was theoretically possible. (Brunski Dep.

17  232:1-20.) As such, the Court concludes that summary judgment at this stage is

18  inappropriate. Based on the record before the Court, there is a genuine of fact

19  whether "rotation" occurs when the Accused Products are in use in a customer's

20  mouth.

21  In its opposition, Zest also relies on the "hinging" that occurs when the

22  original GPS is lowered over the abutment member (Dkt. No. 529-1 at Ex. 10),

23  when snap engaged onto an abutment member (Ex.11), and when the cap is axially

24  loaded (Ex. 12).  Each of these alternatives suffers from the same deficiency that

25  rotation outside of the mouth suffers from, i.e., the rotation does not occur while the

26  male is in use within the mouth.  As such, these theories lack any basis.

27  Accordingly, for the foregoing reasons, the Court finds a genuine issue of fact

28  that pre-acquisition liners and caps include a "swivel joint" between the male liners

1  and caps based on the "rotation" theory.

2  **e.    Doctrine of Equivalents**

3  In the alternative, Zest argues that if there is no literal infringement as to the

4  "swiveling" claim, there is infringement through the doctrine of equivalents. (Dkt.

5  No. 494-1 at 31.) In his report, Dr. Brunski explained that the function of the swivel

6  joint/swivel engagement is to provide a rotational or hinging connection between

7  the male and the cap, and in particular, one with freedom of movement between the

8  two components. Dr. Brunski opined that the connection between the GPS male and

9  cap performs the same function in substantially the same way to achieve

10  substantially the same result as the swivel joint claimed in the '219 Patent. (Dkt. No.

11  529-1, Ex. 1 at 21.) This opinion is partly based on the claim that the GPS system

12  achieves rotational or hinging between the male and cap by having a resilient nylon

13  member that is separable from the rigid cap yet both have corresponding surfaces.

14  The resiliency of the GPS male relative to the GPS cap allows for freedom of

15  movement between the male and the cap.  (*Id*.)  In addition, Dr. Brunski opines that

16  the connection between the original GPS male and GPS cap serves the function of

17  providing a means for attachment through rotational or hinging connection that

18  allows for freedom of movement between the male and cap.  (*Id*.)

19  The Supreme Court has recognized that there are "various legal limitations on

20  the application of the doctrine of equivalents" which are "to be determined by the

21  court either on a pretrial motion for partial summary judgment or on a motion for

22  judgment as a matter of law at the close of the evidence and after the jury verdict."

23  *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8. Two such "legal limitations" are: (1) the

24  "all-elements rule," which bars a patentee from asserting "a theory of equivalence

25  [that] would entirely vitiate a particular claim element," and (2) prosecution history

26  estoppel, which bars a patentee from asserting a scope of equivalency surrendered

27  during prosecution. *Id.*

28  Applying the "all-elements rule" to the instant case, the Court holds that

1   microscopic deformation  produced by pressure on a resilient material does not

2   qualify as "swiveling" under the '219 Patent. Zest's doctrine of equivalents

3   argument would vitiate the requirement of swiveling by expanding the term well

4   beyond its construction. *Cf. Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc*., 206

5   F.3d 1408, 1415-16 (Fed. Cir. 2000) (finding no infringement under the doctrine of

6   equivalents because the structures of the patented invention and the accused product

7   were "not even close" (citation and internal quotation marks omitted)).

8         However, IDSI has not addressed Dr. Brunski's opinion regarding the

9   doctrine of equivalents as it applies to the "torque" theory.  Unlike the deformation

10   theory of swiveling, the Court finds that a genuine issue of fact exists whether the

11   pre-acquisition GPS products possess a "swivel joint" under the torque theory.

12                              **e.    Invalidity**

13         IDSI argues that if the Court accepts Dr. Brunski's "late constructions," those

14   claim constructions render Zest's patents invalid as indefinite and obvious from the

15   prior art of the Sulc patent, 4,540,367 (Sept. 10, 1985), (filed in this case as Dkt.

16   No. 475-10). Zest counters that IDSI cannot assert an invalidity defense because

17   Implant Direct informed Zest in supplemental interrogatory responses that Implant

18   Direct did not currently contend that the patents were invalid.  (Dkt. No. 494-1 at

19   40.)

20         This argument brings to a head a contention between the Parties that has been

21   repeated in briefing on multiple motions in this case.  On one hand, Zest repeatedly

22   asserts that infringement and invalidity are two completely separate analyses, and

23   that it is legal error for IDSI to "rel[y] on its distorted interpretation of Zest's

24   infringement case to argue invalidity." (Dkt. No. 494-1 at 3.)

25         At the same time, however, it is also "axiomatic" that "claims are construed

26   the same way for both invalidity and infringement." *Source Search Techs., LLC v.*

27   *LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) (citing *Amgen Inc. v.*

28   *Hoechst Marion Roussel, Inc*., 314 F.3d 1313, 1330 (Fed. Cir. 2003). IDSI argues

that Zest may not construe its patents differently when arguing that the patents are valid as opposed to when Zest is arguing that Implant Direct/IDSI's products infringe Zest's patents.

As previously noted, summary judgment of noninfringement is a two-step analysis: "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc.*, 182 F.3d at 1304 (internal citation omitted). Zest's patent infringement case, following these steps, is that (1) the patent claims are construed with their plain meaning; and (2) the (broad) plain meaning reads on the GPS products as opined by Dr. Brunski. IDSI, however, argues in reverse – that the second step (Dr. Brunski's opinions) uses broad interpretations, which means that Zest's patents are invalid if they are interpreted the way Dr. Brunski opines. Zest is correct that IDSI's argument improperly relies on Zest's infringement case to make an invalidity case; but IDSI is correct that the way Zest reads its patent must be consistent when Zest is defending against invalidity and when Zest is arguing infringement.

IDSI's argument is that "Zest's claim constructions render its patents invalid as obvious and anticipated by Sulc." (Dkt. No. 475-1 at 30-34.) However, "[o]bviousness is a question of law with several underlying factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations such as commercial success, long felt but unsolved need, and the failure of others." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) (citing *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007)). Patent invalidity must be established by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2242 (2011).

In its reply, IDSI argues that Zest's expert has interpreted the phrase

1   "releasable snap engagement" and the words "convex," "concave," and "rounded"

2   in ways that stretch the English language beyond its limits. Given Zest's

3   interpretations of the claims, IDSI contends the '219 claims do not succeed in

4   informing those skilled in the art of the invention with reasonable certainty.

5        The Court agrees that a number of opinions of Dr. Brunski misapply the term

6   "swiveling" as constructed by the Court.  In fact, the Court has expressly discounted

7   these opinions.  However, as to other opinions offered by Dr. Brunski, the Court has

8   rejected IDSI's attacks and reasoning.  To the extent that Implant Direct did not

9   waive the invalidity defense, the Court finds IDSI lacks the evidence to support

10  summary judgment due to invalidity. The Court finds that IDSI has failed to

11  demonstrate inconsistency by clear and convincing evidence to entitle it to summary

12  judgment due to patent invalidity.

13              **2.    Induced/Contributory Infringement**

14       As to Zest's claims of induced or contributory patent infringement, IDSI

15  argues that the doctrines of patent exhaustion and implied license preclude all of

16  Zest's claims based on combinations of Zest's products and Implant Direct's

17  products. "Patent exhaustion" and "implied license" are affirmative defenses. *See,*

18  *e.g., Keurig, Inc. v. Sturm Foods, Inc*., 732 F.3d 1370, 1373 (Fed. Cir. 2013) (patent

19  exhaustion); *Carborundrum Co. v. Molten Metal Equip. Innovations, Inc*., 72 F.3d

20  872, 878 (Fed. Cir. 1995) (implied license). Zest opposes IDSI's motion on the

21  ground that this Court has previously disallowed Implant Direct and IDSI from

22  asserting the defenses of patent exhaustion and implied license, and that Defendants

23  may not do so now. (Dkt. No. 494-1 at 32) (citing Dkt. Nos. 301, 331).

24       The Court finds that these affirmative defenses have been waived. As set

25  forth above, Implant Direct failed to plead the affirmative defenses of "patent

26  exhaustion" or "implied license" in its Answer filed on September 17, 2010, (Dkt.

27  No. 17); IDSI's Answer and Counterclaim filed October 16, 2013 was struck by this

28  Court on the ground that IDSI could not assert new claims and defenses in this

litigation, (Dkt. No. 301); and Implant Direct's September 11, 2013 motion to clarify that it may assert patent exhaustion and implied license as defenses was denied by this Court on January 8, 2014, (Dkt. No. 331). In accordance with this Court's prior orders, the Court again finds that patent exhaustion and implied license were not timely pled as affirmative defenses in this case, and the defenses have been waived.

IDSI argues that the Supreme Court recently held in *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843 (2014), that the patentee bears the burden of proving infringement. IDSI claims that this holding "coupled with the context of Zest's claims for induced and contributory infringement" should "lead this Court to look beyond non-analytical dicta [holding that patent exhaustion is an affirmative defense]."

The Court disagrees. Although the Supreme Court in *Medtronic* did affirm the principle that the patentee bears the burden of proving infringement, the fact that the burden is on Plaintiffs to prove their case does not abrogate Defendants' responsibility to plead affirmative defenses in order to avoid waiving them. *See, e.g.*, *Wood v. Milyard*, 132 S. Ct. 1826 (2012) ("Ordinarily in civil litigation, [an affirmative defense] is forfeited if not raised in a defendant's answer or in an amendment thereto. . . An affirmative defense, once forfeited, is excluded from the case." (internal quotation marks and citations omitted)).

### 3.   Willful Infringement

IDSI moves for summary judgment on Zest's claims of willful patent infringement. IDSI argues that summary judgment is appropriate because "Implant Direct had objectively reasonable positions that the GPS products did not infringe Zest's claims, and an objectively reasonable position that dentists were free to use Locator parts purchased from Zest in combination with GPS parts." (Dkt. No. 475-1 at 45.)

The Federal Circuit has outlined a two-prong test for willful infringement.

[10cv541-GPC(WVG)]

*See In Re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  In *Seagate*, the Federal Circuit held that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. *Id.* The *Seagate* court instructed that  "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* When a defense or noninfringement theory asserted by an infringer is purely legal (e.g., claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge. *See Powell v. Home Depot U.S.A., Inc*., 663 F.3d 1221, 1236 (Fed. Cir. 2011); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1324 (Fed. Cir. 2009) (explaining that ensnarement has underlying factual issues but is ultimately a question of law for the judge that is "'to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict'" (quoting *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8)).

Under the objective first prong of the *Seagate* test, the Court must make a threshold determination of objective willfulness based on "an objective assessment of potential defenses based on the risk presented by the patent." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc*., 682 F.3d 1003, 1006 (Fed Cir. 2012). The Court is required to determine, "based on the record ultimately made in the infringement proceedings," whether a "reasonable litigant could realistically expect" those defenses to succeed. *Id.* at 1008 (citation and internal quotation marks omitted). If, in view of the facts, the asserted defenses were not reasonable, only then can the jury's subjective willfulness finding be reviewed for substantial

[10cv541-GPC(WVG)]

evidence. *See Powell*, 663 F.3d at 1236. The question is whether Implant Direct's broader claim construction was so unreasonable that no reasonable litigant could believe it would succeed. *See Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) ("To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." (citation and internal quotation omitted)).

IDSI argues that, under the first prong, Zest "cannot meet its burden of proving an objectively high risk of infringement by clear and convincing evidence." (Dkt. No. 475-1 at 46.) IDSI relies on its arguments against infringement to make the point that Implant Direct's belief that they were not infringing was reasonable.

The Court has held that the GPS male line and cap do not possess a "swivel joint" by virtue of the nylon male liner deforming under pressure. As to rotation of the liner within the cap, Implant Direct offered evidence that Dr. Niznick pointed out that when the liners and caps were actually attached to the abutment, the force necessary to spin the liner around the abutment was less than the force required to spin the liner in the cap. (Niznick Rpt. at 16-17.) Implant Direct relied on this opinion to conclude that the GPS products were not capable of swiveling" in the mouth of the user. However, while a close question, the Court has found that based on a contrary opinion of Dr. Brunski, a question of fact exists as to whether the GPS male liner "swivels" as taught by the patents-at-issue.

Zest argues that summary judgement is inappropriate because the objective recklessness issue is predicated on underlying mixed questions of law and fact. (Dkt. No. 494-1 at 37.) Specifically, Zest contends that a fact finder could find the following facts sufficient to support a conclusion of willful infringement: (1) Implant Direct was aware of the patents-in-suit when it developed the Accused Products, (2) Implant Direct was aware that the patents-in-suit cover Zest's Locator attachment system, (3) Implant Direct instructed its engineers to copy Zest's Locator attachment system, (4) Implant Direct designed the Accused Products to be

used with Zest's Locator attachment system, (5) Implant Direct knew that combining the Accused Products with Zest's Locator attachment system would infringe the patents-in-suit, (6) employees responsible for the design of the Accused Products destroyed documents that would have shown Implant Direct's intent to design the Accused Products in a way that would infringe the patents-in-suit, (7) Implant Direct instructed dentists to combine the Accused Products with Zest's Locator attachment system, and (8) Implant Direct knew that it was unlawful to instruct dentists to combine the Accused Products with Zest's Locator attachment system yet continues to do so. (Dkt. No. 494-1 at 37-38.)

The first four categories of facts cited by Zest involve Implant Direct's awareness or knowledge of the patents-in-suit at the time that the Accused Products were designed (fact categories 1 and 2); and Implant Direct's instructions for engineers to copy the Locator system or make them compatible with the Locator system (fact categories 3 and 4). However, evidence of copying is "of no import on the question of whether the claims of an issued patent are infringed," either literally or by equivalents. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002) (citing *Warner-Jenkinson*, 520 U.S. at 35-36). Accordingly, evidence of copying in a case of direct infringement is "relevant only to *Seagate's* second prong, as it may show what the accused infringer knew or should have known about the likelihood of its infringement." *DePuy Spine,* 567 F.3d at 1336.

Zest relies on *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C08-04990, 2012 WL 233762, at *6 (N.D. Cal. June 7, 2012), for the proposition that copying the ideas of another is properly considered when determining the objective standard for willful infringement. Meanwhile, *Mformation* cites *MeadWestvaco Corp. v. Rexam PLC*, 809 F.Supp.2d 463, 483 (E.D. Va. 2011), to support this conclusion. However, *MeadWestvaco* depends on *Read Corp. v. Portec. Inc*., 970 F.2d 816, 826-27 (Fed. Cir. 1992) which is a pre-*Seagate* case and

1   does not address the objective standard for willful infringement.[4] As to the

2   consideration of copying in evaluating the objective recklessness standard, the

3   Court will follow *DePuy*'s instruction limiting consideration of copying evidence to

4   *Seagate*'s second subjective prong.

5        As to fact category 7 (despoiling discoverable information), the Court has

6   found that Implant Direct failed to produce discoverable communications between

7   employees involved in the design of the Accused Products and despoiled emails

8   regarding the development of the Accused Products. The question remains whether

9   this evidence is properly considered in the objective determination of willfulness.

10  *Seagate* observed that "[t]he state of mind of the accused infringer is not relevant to

11  this objective inquiry." *Seagate*, 497 F.3d at 1371. The *Seagate* court also

12  recognized that "in ordinary circumstances, willfulness will depend on an

13  infringer's prelitigation conduct." *Id.* at 1374. To the extent that the destroyed

14  emails are evidence of the state of mind of Implant Direct's designers, as well as

15  post-litigation conduct (despoiling of discovery), the Court concludes the evidence

16  is not relevant to the objective inquiry.

17       Finally, Zest has offered citations to support fact categories 5 and 8 that

18  Implant Direct knew that combining the Accused Products with Zest's Locator

19  attachment system would infringe the patents-in-suit and knew that it was unlawful

20  to instruct dentists to combine the Accused Products with Zest's Locator attachment

21  system. However, the cited exhibits do not match the claimed evidence. (Dkt. No.

22

23

24  ─────────────

25  [4] The *Read* standard applies in determining whether an infringer "acted in [such]
    bad faith as to merit an increase in damages awarded against him" and instructs a trier

26  of fact to consider in its bad faith determination: (1) whether the infringer deliberately
    copied the ideas or design of another; (2) whether the infringer, when he knew of the

27  other's patent protection, investigated the scope of the patent and formed a good-faith
    belief that it was invalid or that it was not infringed; and (3) the infringer's behavior

28  as a party to the litigation. *Read Corp.*, 970 F.2d at 826-27, *superseded on other
    grounds as recognized in Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575,
    1578 (Fed. Cir.1996).

494-1 at 37-38.) [5]  IDSI, for their part, do not dispute the accuracy of Zest's claims or respond as to the effect this evidence should be accorded.

The *Seagate* court in defining "recklessness" recognized "that 'the term [reckless] is not self-defining.' *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). However, '[t]he civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.' *Id.* (citing Prosser and Keeton § 34, pp. 213-14; Restatement (Second) of Torts § 500 (1965))." *Seagate*, 497 F.3d at 1371. Zest essentially argues that IDSI was reckless because it knew that its actions harmed Zest by infringing on the patents-at-issue.  The Court finds that this evidence creates a genuine issue of fact on the objective recklessness issue that must be decided by the trier of fact at trial. As such, IDSI's motion for summary judgment that any infringement was not wilful is DENIED.[6]

## B.   Trademark Infringement

Aside from Zest's patent claims, Zest's First Amended Complaint also includes causes of action ("COA") for Trademark Infringement (Third COA) under the Lanham Act; False Designation of Origin under the Lanham Act (Fourth COA); False advertising under the Lanham Act (Fifth COA); Unfair Competition under

---

[5]For example, Zest relied on Velez. Decl., Ex.26 at 74:21-75-15, for Implant Direct admissions that combining the GPS abutment with Zest's Locator liner and male would infringe the patents-in-suit.  However, Ex. 26 does not contain the cited portions and instead is a transcript from Dr. Niznick's deposition at 299:1-302:25. (Dkt. No. 551-8.)

[6]Following submission of the pending motions, Defendants submitted supplemental briefing based on the recent Federal Circuit case of *Stryker Corp. v. Zimmer Inc.*, ___ F.3d ___, 2014 WL 7210311 (Fed. Cir. Dec. 19, 2014), and Zest has replied.  (Dkt. Nos. 571, 577.) In *Stryker*, a jury found Zimmer had infringed the plaintiff's patents and the district judge trebled that amount after finding the defendant willfully infringed.  On appeal, the Federal Circuit held that while Zimmer infringed the patents, the infringement was not willful because "Zimmer's defenses to the infringement of each patent claim that Stryker asserted were not objectively unreasonable, and, therefore, it did not act recklessly." *Stryker*, 2014 WL 7210311, at *9.Given that the determination of objectively reckless is fact intensive, the Court does not rely on *Stryker* to reach its decision.

1  California's UCL (Sixth COA); False Advertising under California law (Seventh

2  COA); and Unfair Competition under California Common Law (Eighth COA). (Dkt.

3  No. 13.)

4      IDSI challenges Zest's Trademark Infringement and False Designation of

5  Origin claims under the Federal Lanham Act, as well as Zest's UCL claim, on the

6  ground that the doctrine of nominative fair use bars Zest's claims of trademark

7  infringement. In addition, IDSI challenges Zest's trademark expert, Dr. Susan

8  McDonald, and moves for her exclusion under *Daubert* and Federal Rule of

9  Evidence 702. (Dkt. No. 444.)

10      IDSI's basic argument is that trademark law seeks to address situations where

11  a defendant has used a plaintiff's marks to "incorrectly identify the source of the

12  mark with the defendant itself." *New Kids on the Block v. News Am. Publ'g*, *Inc.*,

13  971 F.2d 302, 306 (9th Cir. 1992). IDSI argues all of the allegedly infringing uses

14  of Zest's marks involve Implant Direct's statements that the Accused Products are

15  compatible with Zest's Locator products. IDSI argues this use is protected as a

16  "nominative fair use."

17      The Ninth Circuit in *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d

18  1171, 1175-76 (9th Cir. 2010) has laid out the test for the "nominative fair use

19  defense" as such:

20      In cases where a nominative fair use defense is raised, we ask whether (1) the
        product was "readily identifiable" without use of the mark; (2) defendant
21      used more of the mark than necessary; or (3) defendant falsely suggested he
        was sponsored or endorsed by the trademark holder. *Playboy Enters., Inc. v.*
22      *Welles*, 279 F.3d 796, 801 (9th Cir. 2002) (quoting *New Kids*, 971 F.2d at
        308-09). This test "evaluates the likelihood of confusion in nominative use
23      cases." *Id*. It's designed to address the risk that nominative use of the mark
        will inspire a mistaken belief on the part of consumers that the speaker is
24      sponsored or endorsed by the trademark holder. The third factor speaks
        directly to the risk of such confusion, and the others do so indirectly:
25      Consumers may reasonably infer sponsorship or endorsement if a company
        uses an unnecessary trademark or "more" of a mark than necessary. But if the
26      nominative use satisfies the three-factor *New Kids* test, it doesn't infringe. If
        the nominative use does not satisfy all the *New Kids* factors, the district court
27      may order defendants to modify their use of the mark so that all three factors
        are satisfied; it may not enjoin nominative use of the mark altogether.
28
    Zest argues IDSI may not raise a nominative fair use defense because

[10cv541-GPC(WVG)]

nominative fair use was never pled as an affirmative defense or raised in interrogatory responses. IDSI counters:

> Ninth Circuit law is clear that it is unnecessary for IDSI to plead or prove nominative fair use as an affirmative defense. In *Toyota*, the Ninth Circuit expressly held that the district court erred in "treat[ing] nominative fair use as an affirmative defense to be established by the Tabaris only after Toyota showed a likelihood of confusion." *Toyota*, 610 F.3d at 1182. The Court held that "[o]n remand, Toyota must bear the burden of establishing that the Tabaris' use of the Lexus mark was *not* nominative fair use." *Id*. at 1182 (emphasis in original).

(Dkt. No. 475-1 at 53.) The Court disagrees with IDSI's reading of *Toyota*. IDSI's cited section of *Toyota* discusses improper burden shifting by the district court – nowhere does the Ninth Circuit say it is unnecessary that defendants "plead" nominative fair use as an affirmative defense. While it is true that the *Toyota* court held that "[a] defendant seeking to assert nominative fair use as a defense need only show that it used the mark to refer to the trademarked good [and] [t]he burden then reverts to the plaintiff to show a likelihood of confusion," 610 F.3d at 1183, Implant Direct/IDSI must still have raised the defense as an affirmative defense. *See, e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) (calling nominative fair use and fair use affirmative defenses); *Gorski v. The Gymboree Corporation*, No. 14-CV-01314-LHK, 2014 WL 3533324, at *7 (N.D. Cal. Jul. 16, 2014) (Koh, J.) (addressing nominative fair use as an affirmative defense); *1800 GET THIN, LLC v. Hiltzik*, No. CV11-00505 ODW (PJWx), 2011 WL 3206486, at *2 (C.D. Cal. Jul. 25, 2011) (recognizing nominative fair use as an affirmative defense to trademark infringement).

The Court agrees with Zest's contention that to hold otherwise would unfairly allow Defendants to, as here, wait until the eve of trial to raise a nominative fair use defense for which the Ninth Circuit has held it is the plaintiff's burden to disprove. *See Toyota*, 610 F.3d at 1182-83. Therefore, IDSI's Motion for Summary Judgment on Zest's trademark claims is DENIED.

### 1.   Expert Report of Dr. Susan McDonald

The Court notes here that IDSI moves to exclude the expert report of Dr.

1  Susan McDonald. (Dkt. No. 444.) IDSI primarily moves to exclude the report on the

2  ground that Dr. McDonald did not address the Nominative Fair Use factors and her

3  opinions are therefore irrelevant and unreliable. Zest counters that Dr. McDonald

4  submitted her report in January 2013, long before IDSI asserted a nominative fair

5  use defense in its summary judgment motion filed in July 2014. The Court denies

6  IDSI's motion on the ground that, as discussed above, IDSI did not timely raise a

7  nominative fair use defense.

8       IDSI's motion to exclude Dr. McDonald's report also argues that Dr.

9  McDonald should be precluded from testifying as to Defendants' "bad faith" and as

10 to trademark dilution. (Dkt. No. 444-1 at 21-24.) Zest does not rely on these points

11 in opposition to summary judgment. The Court overrules these objections to Dr.

12 McDonald's report and denies them without prejudice.  IDSI may renew its

13 arguments in motions in limine to the extent they are still relevant.

14       **C.    False Designation of Origin, UCL, and False Advertising**

15       IDSI argues it is entitled to judgment on the pleadings as to all of Zest's

16 federal and state false advertising claims due to Zest's failure to meet the

17 heightened pleading standards of Federal Rule of Civil Procedure 9(b). The Parties

18 dispute whether "judgment on the pleadings" is appropriate at this stage as well as

19 whether Zest's federal False Advertising allegations must meet the heightened

20 pleading standards of Rule 9(b).

21       As an initial matter, IDSI's motion focuses on the sufficiency of Zest's First

22 Amended Complaint. As the Court will not consider materials outside the pleadings

23 in considering the sufficiency of Zest's federal and state false advertising claims,

24 the Court will treat IDSI's motion with respect to these claims as a motion for

25 judgment on the pleadings. *See* Fed. R. Civ. P. 12(c) ("After the pleadings are

26 closed – but early enough not to delay trial – a party may move for judgment on the

27 pleadings."); *but see Techsavies, LLC v. WDFA Mktg. Inc*., C10-1213 BZ, 2011 WL

28 996267 (N.D. Cal. Mar. 17, 2011) (converting a motion for judgment on the

1  pleadings into a motion for summary judgment because "[i]ssues about whether
2  [defendant] adequately pled its affirmative defenses and counterclaims should have
3  been raised well before the last day for dispositive motions").

4          Second, although the Ninth Circuit has yet to decide whether the heightened
5  pleading requirements of Rule 9(b) apply to Lanham Act claims, the Ninth Circuit
6  has applied the rule to other types of false advertising claims under California law.
7  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125-27 (9th Cir. 2009) (applying
8  Rule 9(b) to claim for false advertising under California Business and Professions
9  Code section 17200); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102-04 (9th
10  Cir. 2003) (applying Rule 9(b) to claim for false advertising under California
11  Business and Professions Code section 17500). District courts have, in turn,
12  extended that rule to false advertising claims under the Lanham Act. *See, e.g., VIP*
13  *Products, LLC v. Kong Co. LLC*, No. CV10-0998-PHX-DGC, 2011 WL 98992, at
14  *3-4 (D. Ariz. Jan. 12, 2011); *Ecodisc Tech. AG v. DVD Format/Logo Licensing*
15  *Corp.*, 711 F. Supp. 2d 1074, 1085 (C.D. Cal. 2010); *Pom Wonderful LLC v. Ocean*
16  *Spray Cranberries, Inc*., 642 F. Supp. 2d 1112, 1123-24 (C.D. Cal. 2009). The
17  Court adopts the approach of these courts and applies Rule 9(b) to Plaintiffs' false
18  advertising allegations.

19          However, even applying the heightened pleading requirements of Rule 9(b),
20  the Court finds Zest's false advertising allegations as alleged in the First Amended
21  Complaint sufficient to state a claim for false advertising. IDSI argues Zest's false
22  advertising claims fail to meet the heightened pleading standards of Rule 9(b)
23  because Zest "does not allege what specific Implant Direct advertisements allege
24  that Implant Direct products are affiliated with or authorized by Zest, what words
25  Implant Direct uses to communicate this message, or any specific false claims."
26  (Dkt. No. 475-1 at 57-58.)

27          The Court disagrees. In particular, Zest's Amended Complaint alleges that:
28          Implant Direct is using the ZEST and LOCATOR trademarks in a
           prominent manner in connection with the "GoDirect" product such that

- 40 -                                    [10cv541-GPC(WVG)]

consumers are likely to be confused into believing that the "GoDirect" product is authorized, endorsed or sponsored by Zest. (A printout of this advertisement from the Implant Direct website is attached hereto as Exhibit H). Further, the words "Featuring ZEST LOCATOR Compatible Platform" are also likely to cause confusion, deception or mistake because the "GoDirect" product is not in fact "compatible" with the Zest LOCATOR attachment system, but is instead a copy of one or more of the components of the Zest LOCATOR attachment system. Furthermore, the use of the same words "Featuring Zest LOCATOR Compatible Platform" in describing the "Go Direct" and the Zest Locator is likely to cause confusion, deception or mistake among consumers.

(Dkt. No. 13, FAC ¶ 37.) This allegation in itself appears to plead "the who, what, when, where, and how" of the alleged false advertising. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Specifically, the "who" is Implant Direct; the "what" is representing the GoDirect product as authorized, endorsed, or sponsored by Zest; the "when, where, and how" is placing the advertisement on Implant Direct's website. Considering only the pleadings, the Court finds that Zest's FAC states a claim for state and federal false advertising.  Accordingly, the Court DENIES IDSI's motion for judgment on the pleadings.

## II.     Implant Direct's Motion for Summary Judgment/to Amend Invalidity Contentions

Implant Direct joins IDSI's motions. (Dkt. Nos. 472, 484.) However, Implant Direct also separately moves for partial summary judgment that Implant Direct did not infringe the Zest Patents and did not willfully infringe Zest Patents. (Dkt. Nos. 478, 529.) In addition, Implant Direct moves to amend its invalidity contentions, (*id.*), and to exclude the expert report of Zest's indirect patent infringement expert, Dr. Robert C. Vogel, (Dkt. No. 454-1).

### A.     Direct Patent Infringement

As to Zest's patent infringement claims, Implant Direct seeks partial summary judgment of non-infringement on three additional subsets of Zest's claims: (1) on any claims related to the updated GPS male, the "internal connection" male; (2) on any claims that the GoDirect implant infringes Claims 1, 21, and 23 of the '219

1   Patent or Claim 1 of the '447 Patent; and (3) on any claims related to infringement

2   of Claims 5 and 9 of the '219 Patent. (Dkt. No. 529 at 7-10.) In addition, Implant

3   Direct argues it is entitled to summary judgment because "[a]ll of the asserted

4   claims of the '219 and '447 Patents require multiple component parts to be

5   combined together in an overall assembly" while Implant Direct did not sell its

6   dental attachment products in an assembled form. (Dkt. No. 529 at 10-12.)

### 1.   Internal Connection (revised) GPS Male

8   Implant Direct first moves for partial summary judgment on any of Zest's

9   claims against Implant Direct related to the GPS internal connection product. (Dkt.

10  No. 529 at 7-8.) Implant Direct argues the GPS internal connection male was not

11  developed until 2011 and that Implant Direct did not make or sell the GPS internal

12  connection product. (*Id.* at 8) (citing July 19, 2011 Niznick Depo at 134).

13  Zest responds that genuine issues of material fact preclude summary

14  judgment on whether Implant Direct developed the GPS internal connection product

15  prior to the transferring of its assets and liabilities to IDSI at the end of 2010. (Dkt.

16  No. 495-1 at 15-16.) Zest cites Dr. Niznick's deposition testimony for the

17  proposition that "Dr. Niznick . . . created and designed the original and revised GPS

18  males at the same time in March of 2010." (*Id.* at 16) (citing Velez Decl. Ex. 7,

19  Niznick Depo at 187:6-188:8).

20  In reply, Implant Direct points out that development is not the same as

21  making or selling a product, and Zest has not cited any legal authority for the

22  proposition that "the mere conception or design of a product constitutes patent

23  infringement." (Dkt. No. 509 at 2.)

24  The Court GRANTS Implant Direct's motion with respect to Zest's patent

25  infringement claims related to the revised GPS internal connection male. The record

26  is clear that Implant Direct did not sell or offer to sell the GPS internal connection

27  male. (*See* Dkt. No. 478-1, Statement of Undisputed Facts 3, 5.) While Dr. Niznick

28  may have testified to designing the GPS internal connection male prior to the sale of

1  Implant Direct's assets and liabilities to IDSI, patent infringement law protects only
2  unauthorized "mak[ing], us[ing], offer[ing] to sell, or sell[ing of] any patented
3  invention." 35 U.S.C. § 271(a). Zest has pointed to no issues of fact as to whether
4  Implant Direct made, used, offered to sell, or sold the GPS internal connection male
5  prior to transferring assets and liabilities to IDSI, and the Court GRANTS Implant
6  Direct summary judgment on this issue.

### 2.   GoDirect Implant

8  Second, Implant Direct moves for summary judgment on Claims 1, 21, and 23
9  of the '219 Patent and Claim 1 of the '447 Patent on the ground that these claims
10  require an "abutment member" and the GoDirect implant is an implant, not an
11  abutment. (Dkt. No. 529 at 8-9.) The issue here is that in the Zest Patents, the
12  "abutment member" claims state that the abutment member is for "attachment to a
13  tooth root, implant, or adjacent tooth." *See* '219 Patent Claim 1. This is because
14  Zest's patented assembly is for an abutment, liner, and cap – whereby the abutment
15  would ordinarily screw into an implant (such as the implants sold by Implant
16  Direct). However, Dr. Niznick designed his GoDirect implant product as an implant
17  pre-attached to an abutment made with Zest's abutment specifications. Implant
18  Direct is therefore claiming that the GoDirect implant is not an "abutment" because
19  it is not for attachment to a tooth root, implant, or adjacent tooth – because the
20  implant is pre-attached, it would not make sense to attach another implant to the
21  GoDirect implant.

22  Zest argues there is no dispute that the GoDirect product has both an
23  abutment and an implant, citing IDSI's acknowledgment of this fact and Dr.
24  Niznick's failed applications to the patent office for his GoDirect implant. (Dkt. No.
25  495-1 at 17.) Because of Zest's conclusion that the GoDirect is really an "abutment
26  plus" [an implant], Zest relies on the fact that the claim language uses the word
27  "comprising" to conclude that extraneous parts (the attached implant) do not render
28  the abutment portion of the GoDirect no longer an abutment. (*Id.* at 16-17) (citing

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)).

The Court finds that there is a genuine issue of material fact precluding summary judgment on whether the GoDirect implant is an "implant," as Implant Direct contends, or an "abutment attached to an implant" as Zest contends.

### 3.   Claims 5 and 11 of the '219 Patent

Implant Direct also moves for summary judgment on Zest's claims that Implant Direct's Accused Products infringe claim 5 and 11 of the '219 Patent on the ground that Zest has abandoned these claims. (Dkt. No. 529 at 9-10.) Zest asks that the Court should "deny this motion as moot because Zest informed ID in its most recent interrogatory responses that it was not asserting infringement of Claims 5 and 11." (Dkt. No. 495-1 at 20.)

Zest does not provide any authority for the proposition that interrogatory responses can render an issue moot.  Nonetheless, given Zest's interrogatory responses and the lack of any opposition to Implant Direct's motion on this issue, the Court GRANTS partial summary judgment as Claims 5 and 11 of the '219 Patent.

### 4.   Entire Assembly

Implant Direct argues that "[a]ll of the asserted claims of the '219 and '447 Patents require multiple component parts to be combined together in an overall assembly," yet Implant Direct did not "make, use, offer to sell, or sell its dental attachment products in an assembled form." (Dkt. No. 529 at 10.) Implant Direct claims that Zest has not provided any evidence that Implant Direct infringed the Zest Patents by making or selling a complete assembly. (*Id.*) (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2118 (2014)).

Zest argues Implant Direct failed to disclose this new non-infringement theory in interrogatory responses or update its expert reports to include this defense. (Dkt. No. 495-1 at 20-22.) In addition, Zest argues Implant Direct's theory fails as a

matter of law because the "Federal Circuit has routinely held that the preamble does not limit claim scope." (Dkt. No. 495-1 at 22) (citing *Digitech Image Techs., LLC v. Elec. for Imaging, Inc.*, No. 2013-1600, 2014 WL 3377201, at *5 (Fed. Cir. 2014)). Finally, Zest argues that *Deepsouth* and the other cases relied upon are inapposite and do not apply to cases, such as the present one, where the products at issue are sold as a unit (i.e., abutment, male, and cap are sold together in a kit) and the patents-in-suit have claims directed to that combination of components.

As to the asserted failure to disclose this non-infringement theory, Zest fails to identify the source of the obligation to assert the "assembled as a whole" non-infringement theory. Instead, Zest relies upon civil procedure rules governing the supplementing of expert disclosures and responses to discovery requests. (Dkt. No. 495-1 at 20-21.) Absent specific facts to establish an obligation to disclose the non-infringement theory, the Court finds that Implant Direct is not precluded from asserting this theory of non-infringement.

On the merits, the Court finds that *Deepsouth* and the other cases relied upon by Implant Direct are inapplicable to the instant case. In *Deepsouth*, the issue presented was limited to whether a defendant exporting an allegedly infringing product in less than fully assembled form for use abroad constituted an unauthorized "making" of any patented invention within the United States. The Supreme Court held that the word "makes" as used in 35 U.S.C. section 271(a) does not extend to the manufacture of the constituent parts of a combination machine, and the unassembled export of the elements of an invention does not infringe the patent.

In the instant case, the evidence demonstrates that Implant Direct sells, within the United States, the Accused Products as a unit consisting of the abutment, male and cap. (Dkt. No. 495-1, Ex. 44.) The Court rejects the contention that the patents-in-suit require an "operable" assembly. There is nothing within the claims or specifications that imposes such a limitation.

///

[10cv541-GPC(WVG)]

**B.     Willful Patent Infringement**

Implant Direct also contends that summary judgment is appropriate as to the issue of willfulness based on pre-acquisition product infringement.  For the same reasons outlined above as to IDSI's motion, the motion is DENIED.

**C.     Implant Direct's Motion to Amend Invalidity Contentions**

Implant Direct also moves, pursuant to Patent Local Rule 3.6(b)(3), to amend its invalidity contentions in light of: (1) the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014); and (2) the updated report and testimony given by Zest's patent infringement expert, Dr. Brunski.  (Dkt. No. 529 at 20-37.)  Implant Direct contends that *Nautilus* set forth a new standard for indefiniteness regarding the invalidity of patent claims. (*Id.* at 20-21.)  Implant Direct also contends that Dr. Brunski's updated report and deposition indicated that Zest was raising a new "friction fit" theory of infringement (i.e., that the Accused Products infringe the releasable snap engagement limitation through a friction fit rather than a snap engagement).[7]  (*Id.* at 32-34.)  In addition, Implant Direct argues that it has been diligent in bringing this motion and that Zest will not be unduly prejudiced.  (*Id.* at 35-36.)

Zest counters that Implant Direct's motion to amend its invalidity contentions should be denied because: (1) Implant Direct informed Zest in its 2012 interrogatory responses that it would not be pursuing an invalidity defense, and therefore Zest did not pursue any related discovery; (2) Implant Direct's motion is untimely; (3) the Supreme Court's *Nautilus* decision is irrelevant; (4) Zest is not asserting a friction

---

[7]On January 31, 2014, the Court previously denied without prejudice Implant Direct's prior motion to amend its invalidity contentions related to Zest's purported "friction fit" theory of infringement.  (Dkt. No. 362 at 13.)  The Court reasoned that it was "not convinced that Plaintiffs are yet pursuing a new infringement theory" and noted that "Plaintiffs have not amended their infringement contentions to include a 'friction fit' theory" and "the parties have not yet taken any expert discovery."  (*Id.*)  The Court also reminded the parties that for any future motion to amend contention, "the party seeking amended must meet the Patent Local Rules' burden of showing good cause to amend and no undue burden on the opposing party" under Patent Local Rule 3.6. (*Id.* at 13-14.)

[10cv541-GPC(WVG)]

1  fit infringement theory; and (5) Zest would be unduly prejudiced if Implant Direct is

2  allowed to amend because it would require the Court to reopen discovery and allow

3  another round of summary judgment motions.  (Dkt. No. 495-1 at 31-41.)

4      Implant Direct replies that: (1) the Supreme Court's *Nautilus* decision is

5  applicable; (2) Dr. Brunski's testimony shows that Zest is asserting a friction fit

6  theory; (3) its motion is timely because it could not have brought it until after Dr.

7  Brunksi's deposition and the *Nautilus* decision; and (4) Zest will not suffer undue

8  prejudice because the amendments will not require re-opening fact discovery and

9  Zest has caused much delay in this action.  (Dkt. No. 509 at 15-19.)

10     Patent Local Rule 3.6(b)(3) provides that after the completion of claim

11  construction discovery, "absent undue prejudice to the opposing party, a party

12  opposing infringement may only amend its validity contentions upon a timely

13  motion showing good cause."  To make a satisfactory showing of good cause, a

14  party seeking to amend its invalidity contentions must show that it "acted with

15  diligence in promptly moving to amend."  *O2 Micro Int'l Ltd. v. Monolithic Power*

16  *Sys., Inc.,* 467 F.3d 1355, 1363 (Fed. Cir. 2006).  If the moving party is able to

17  establish diligence, the Court should then consider prejudice to the non-moving

18  party in determining whether to grant leave to amend.  *See id.* at 1368.

19     The Court concludes that Implant Direct has failed to show that it acted with

20  diligence in seeking amendment of its invalidity contentions.  Implant Direct waited

21  nearly three months after the Supreme Court issued *Nautilus* on June 2, 2014 to file

22  this motion on August 18, 2014.  In addition, Implant Direct did not file this motion

23  until five months after it received Dr. Brunski's updated report on March 14, 2014,

24  and almost two months after Dr. Brunski's deposition on June 20, 2014.  *See O2*

25  *Micro Int'l Ltd.*, 467 F.3d at 1367 (district court did not abuse its discretion by

26  finding lack of diligence where the defendant waited almost three months after

27  deposition to serve its proposed amended contentions and two more weeks to

28  formally move to amend); *Verinata Health Inc. v. Ariosa Diagnostics, Inc.*, No. 12-

1  cv-5501-SI, 2014 WL 1648175, at *3 (N.D. Cal. Apr. 23, 2014) (determining that

2  the defendant was diligent in seeking to amend its invalidity contentions where it

3  provided the plaintiff the proposed amendments two days after the court granted the

4  plaintiff's motion to amend its infringement contentions, and defendant filed its

5  motion about a week after the plaintiff refused to consent to the proposed

6  amendments).

7      Moreover, the Court concludes that amendment of Implant Direct's invalidity

8  contentions would prejudice Zest.  Allowing Implant Direct to amend its invalidity

9  contentions at this late stage would require the Court to reopen fact and expert

10  discovery and the summary judgment motion deadline.  *See CBS Interactive, Inc. v.*

11  *Etilize, Inc.*, 257 F.R.D. 195, 203 (N.D. Cal. 2009) (finding that the defendant's

12  "right to amend in good faith is far outweighed by its (and the court's)

13  countervailing duty to avoid prejudicing [the plaintiff] through eleventh-hour

14  alterations"); *see also Verinata Health Inc.*, 2014 WL 1648175, at *3 (determining

15  that the plaintiff would not be prejudiced by the defendants' amendment of

16  invalidity contentions because there was still ample time left in the discovery period

17  as four months remained until the close of fact discovery and seven months

18  remained until the close of expert discovery).

19      Accordingly, the Court DENIES Implant Direct's motion to amend its

20  invalidity contentions.

21      **D.      Motion to Exclude Dr. Vogel's Testimony and Report**

22      Implant Direct moves to exclude Dr. Robert C. Vogel from testifying at trial

23  or any proceeding in this action on the grounds that the proposed expert testimony

24  fails to satisfy the standards established under Federal Rule of Evidence 702 and

25  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).  (Dkt. No. 450.)

26      Zest responds that Dr. Vogel's report and deposition testimony clearly

27  establish that he is qualified as an expert on the subject of his opinions and that his

28  opinions are reliable. (Dkt. No. 497 at 1.)

1   Zest's response to Implant Direct's Motion for Summary Judgment relies on

2   Dr. Vogel's opinions only once: to support the contention that "the reports and

3   sworn testimony of Drs. Brunski and Vogel support the conclusion that a person of

4   ordinary skill in the art at the time of invention would have considered the GoDirect

5   product as containing an abutment as claimed in the patents-in-suit." (Dkt. No.

6   495-1 at 19-20 & n.77.)

7       The Court DENIES the motion as to these summary judgment proceedings, as

8   the Court has not relied on Dr. Vogel's opinions in arriving at its decision and thus

9   the motion to exclude is MOOT.

10              **CONCLUSION AND ORDER**

11      For the foregoing reasons, the Court:

12   1.   **DENIES WITHOUT PREJUDICE** IDSI's Motion in Limine to

13        Exclude Report and Testimony of Dr. Susan Schwartz McDonald,

14        (Dkt. No. 444);

15   2.   **DENIES WITHOUT PREJUDICE** Implant Direct's Motion to

16        Exclude the Expert Witness Testimony of Dr. Robert C. Vogel, (Dkt.

17        No. 450);

18   3.   **GRANTS** in part and **DENIES** in part the IDSI Defendants' Omnibus

19        Motions for Judgment on the Pleadings Motion and for Summary

20        Judgment, (Dkt. No. 475);

21   4.   **GRANTS** in part and **DENIES** in part the Implant Direct Defendants'

22        Motions for Partial Summary Judgment and to Amend Invalidity

23        Contentions, (Dkt. No. 478);

24   5.   **GRANTS** IDSI's *Ex Parte* Application for Leave to Supplement

25        Record, (Dkt. No. 539), to the extent it seeks to supplement the record,

26        but **DENIES** IDSI's request to file additional supplemental briefing;

27        and

28   6.   **GRANTS** IDSI's *Ex Parte* Application for Leave to Supplement

Record Regarding Claim Construction Hearing, (Dkt. No. 555).

**IT IS SO ORDERED.**

DATED:  February 3, 2015

HON. GONZALO P. CURIEL
United States District Judge

[10cv541-GPC(WVG)]